# UNITED STATES CIVIL SERVICE COMMISSION ET AL. *v.* NATIONAL ASSOCIATION OF LETTER CARRIERS, AFL–CIO, ET AL.

No. 72–634.  Argued March 26, 1973—Decided June 25, 1973

WHITE, J., delivered the opinion of the Court, in which BURGER, C. J., and STEWART, BLACKMUN, POWELL, and REHNQUIST, JJ., joined. DOUGLAS, J., filed a dissenting opinion, in which BRENNAN and MARSHALL, JJ., joined, *post,* p. 595.

*Solicitor General Griswold* argued the cause for appellants. With him on the briefs were *Assistant Attorney General Wood, Andrew L. Frey, Robert E. Kopp,* and *Anthony L. Mondello.*

*Thomas C. Matthews, Jr.,* argued the cause for appellees. With him on the brief were *Stephen M. Truitt, Melvin L. Wulf, Ralph J. Temple,* and *Philip Elman.**

*Briefs of *amici curiae* urging affirmance were filed by *Lee Johnson,* Attorney General, *John W. Osburn,* Solicitor General, and *A. J. Laue*

Mr. Justice White delivered the opinion of the Court.

On December 11, 1972, we noted probable jurisdiction of this appeal, 409 U. S. 1058, based on a jurisdictional statement presenting the single question whether the prohibition in § 9 (a) of the Hatch Act, now codified in 5 U. S. C. § 7324 (a)(2), against federal employees taking "an active part in political management or in political campaigns," is unconstitutional on its face. Section 7324 (a) provides:

> "An employee in an Executive agency or an individual employed by the government of the District of Columbia may not—
>
> "(1) use his official authority or influence for the purpose of interfering with or affecting the result of an election; or
>
> "(2) take an active part in political management or in political campaigns.
>
> "For the purpose of this subsection, the phrase 'an active part in political management or in political campaigns' means those acts of political management or political campaigning which were prohibited on the part of employees in the competitive service before July 19, 1940, by determinations of the Civil Service Commission under the rules prescribed by the President." [1]

---

and *Thomas H. Denney,* Assistant Attorneys General, for the State of Oregon; and by *Stephen J. Pollak, Richard T. Conway, Leo M. Pellerzi, Donald M. Murtha, Robert H. Chanin, A. L. Zwerdling,* and *Edward J. Hickey, Jr.,* for the Coalition of American Public Employees et al.

[1] The Hatch Act is found in Titles 5 and 18 of the United States Code, both of which have been enacted into positive law. 80 Stat. 378, 62 Stat. 683. Section 7324 (a)(2) of Title 5 is derived from two sections in the Act, with the prohibition against certain political

A divided three-judge court sitting in the District of Columbia had held the section unconstitutional. 346 F. Supp. 578 (1972). We reverse the judgment of the District Court.

I

The case began when the National Association of Letter Carriers, six individual federal employees and certain local Democratic and Republican political committees filed a complaint, asserting on behalf of themselves and all federal employees that 5 U. S. C. § 7324 (a)(2) was unconstitutional on its face and seeking an injunction against its enforcement.[2]

Each of the plaintiffs alleged that the Civil Service Commission was enforcing, or threatening to enforce, the Hatch Act's prohibition against active participation in political management or political campaigns with respect to certain defined activity in which that plaintiff desired to engage.[3] The Union, for example, stated

activity being found in § 9 (a), 53 Stat. 1148, while the portion defining the proscribed activity stems from § 15, 54 Stat. 771.

[2] The complaint made the same allegations with respect to 5 U. S. C. § 1502 (a)(3), the provision taken from § 12 (a) of the Hatch Act, 54 Stat. 767, which imposes similar prohibitions on certain state employees working in programs that are federally financed. The District Court, however, while holding the class action was proper with respect to federal employees, held that none of the parties was properly representative of state employees covered by the Act. 346 F. Supp. 578, 579 n. 1. Hence only § 7324 (a)(2) with respect to federal employees is before us in this case.

[3] The Union alleged that its members were desirous of

"a. Running in local elections for such offices as school board member, city council member or mayor.

"b. Writing letters on political subjects to newspapers.

"c. Participating as a delegate in a political convention and running for office in a political party.

"d. Campaigning for candidates for political office." App. 6–7.

The Democratic and Republican Committees complained that they had been deterred "from seeking desirable candidates who are Fed-

among other things that its members desired to campaign for candidates for public office. The Democratic and Republican Committees complained of not being able

eral or state employees covered by the Hatch Act to run on the Democratic or Republican ticket for state and local offices. In addition, numerous individuals who would otherwise desire and be available to become members of Plaintiff Committees have been and continue to be deterred from doing so by said provisions of the Hatch Act." *Id.*, at 7.

Plaintiff Hummel alleged that he desired to engage in a wide variety of political activities including "(1) participation as a delegate in conventions of a political party; (2) public endorsement of candidates of a political party for local, state and national office; (3) work at polling places on behalf of a political party during elections; (4) holding office in a political club. As a result of inquiries of the Civil Service Commission and his knowledge of the Hatch Act, Plaintiff Hummel is aware that such activities violate the Hatch Act." *Id.*, at 7–8.

Plaintiff Pinho alleged that she desired to become a precinct Democratic Committee Woman in the Arlington County Democratic Committee and to campaign for certain Democratic candidates for the United States House of Representatives and for the United States Senate. *Id.*, at 8.

Plaintiff Mandicino alleged that as an active member and officer of plaintiff Union he "was compelled to engage in political activities prohibited by . . . the Hatch Act in order to carry out the responsibilities of his offices," and that he had engaged in those "activities including house-to-house campaigning for candidates of political parties, participation as a delegate in conventions of a political party, active participation in the affairs of a political party, and fund raising on behalf of political parties and candidates." *Ibid.*

Plaintiff Wylie alleged that he had resigned his position in the Department of Health, Education, and Welfare, a position in the competitive civil service, to run as a Republican candidate for the Maryland State Senate. During the campaign he was employed as a consultant by the Department on a part-time basis. After his defeat he sought re-employment on a permanent basis but because of the dispute over his political activities while acting as a consultant, his re-employment had been delayed for a period of time, all to his financial loss and mental anguish. *Id.*, at 9.

Plaintiff Gee alleged that he desired to, but did not, file as a

to get federal employees to run for state and local offices. Plaintiff Hummel stated that he was aware of the provision of the Hatch Act and that the activities he desired to engage in would violate that Act as, for example, his participating as a delegate in a party convention or holding office in a political club.

A three-judge court was convened, and the case was tried on both stipulated evidence and oral testimony. The District Court then ruled that § 7324 (a)(2) was unconstitutional on its face and enjoined its enforcement. The court recognized the "well-established governmental interest in restricting political activities by federal employees which [had been] asserted long before enactment of the Hatch Act," 346 F. Supp., at 579, as well as the fact that the "appropriateness of this governmental objective was recognized by the Supreme Court of the United States when it endorsed the objectives of the Hatch Act. United Public Workers v. Mitchell, 330 U. S. 75 . . . (1947) . . . ." Id., at 580. The District Court ruled, however, that United Public Workers v. Mitchell, 330 U. S. 75 (1947), left open the constitutionality of the statutory definition of "political activity," 346 F. Supp., at 580, and proceeded to hold that definition to be both vague and overbroad, and therefore unconstitutional and unenforceable against the plaintiffs in any respect. The District Court also added, id., at 585, that even if the Supreme Court in Mitchell could be said to have upheld the definitional section in its entirety, later decisions had so eroded the holding

candidate for the office of Borough Councilman in his local community for fear that his participation in a partisan election would endanger his job. Ibid.

Plaintiff Myers alleged that he desired to run as a Republican candidate in the 1971 partisan election for the mayor of West Lafayette, Indiana, and that he would do so except for fear of losing his job by reason of violation of the Hatch Act. Id., at 10.

that it could no longer be considered binding on the District Court.

## II

As the District Court recognized, the constitutionality of the Hatch Act's ban on taking an active part in political management or political campaigns has been here before. This very prohibition was attacked in the *Mitchell* case by a labor union and various federal employees as being violative of the First, Ninth, and Tenth Amendments and as contrary to the Fifth Amendment by being vague and indefinite, arbitrarily discriminatory, and a deprivation of liberty. The Court there first determined that with respect to all but one of the plaintiffs there was no case or controversy present within the meaning of Art. III because the Court could only speculate as to the type of political activity the appellants there desired to engage in or as to the contents of their proposed public statements or the circumstances of their publication. As to the plaintiff Poole, however, the Court noted that "[h]e was a ward executive committeeman of a political party and was politically active on election day as a worker at the polls and a paymaster for the services of other party workers." 330 U. S., at 94. Plainly, the Court thought, these activities fell within the prohibition of § 9 (a) of the Hatch Act against taking an active part in political management or political campaigning; and "[t]hey [were] also covered by the prior determinations of the [Civil Service] Commission," *id.*, at 103 (footnote omitted), as incorporated by § 15 of the Hatch Act,[4] the Court relying on a

---

[4] Section 15 of the Hatch Act, now codified in 5 U. S. C. § 7324 (a) (2), see n. 1, *supra*, defined the prohibition against taking "an active part in political management or in political campaigns" as proscribing those activities that the Civil Service Commission had determined up to the time of the passage of the Hatch Act were

Civil Service Commission publication, Political Activity and Political Assessments, Form 1236, Sept. 1939, for the latter conclusion. *Id.,* at 103 n. 38. Poole's complaint thus presented a case or controversy for decision, the question being solely whether the Hatch Act "without violating the Constitution, [could make this conduct] the basis for disciplinary action." *Id.,* at 94. The Court held that it could. "[T]he practice of excluding classified employees from party offices and personal political activity at the polls ha[d] been in effect for several decades," *id.,* at 96; and the Court, over a single dissent, in *Ex parte Curtis,* 106 U. S. 371 (1882), had previously upheld the longstanding prohibition forbidding federal employees "from giving or receiving money for political purposes from or to other employees of the government," 330 U. S., at 96. "The conviction that an actively partisan governmental personnel threatens good administration has deepened since . . . *Curtis,*" *id.,* at 97–98, Congress having recognized the "danger to the service in that political rather than official effort may earn advancement and to the public in that governmental favor may be channeled through political connections." *Id.,* at 98 (footnote omitted).

The Government, the Court thought, was empowered to prevent federal employees from contributing energy as well as from collecting money for partisan political ends: "Congress and the President are responsible for an efficient public service. If, in their judgment, efficiency may be best obtained by prohibiting active participation by classified employees in politics as party officers or workers, we see no constitutional objection." *Id.,* at 99 (footnote omitted). Another Congress might determine otherwise, but "[t]he teaching of experience . . . evi-

prohibited for classified civil service employees. The role and scope of § 15 are discussed in the text, *infra.*

dently led Congress to enact the Hatch Act," *id.*, at 99, which the Court refused to invalidate and which it viewed as leaving "untouched full participation by employees in political decisions at the ballot box and forbids only the partisan activity of federal personnel deemed offensive to efficiency." *Ibid.* The Act did not interfere with a "wide range of public activities." *Id.*, at 100. It was "only partisan political activity that is interdicted. . . . [Only] active participation in political management and political campaigns [is proscribed]. Expressions, public or private, on public affairs, personalities and matters of public interest, not an objective of party action, are unrestricted by law so long as the government employee does not direct his activities toward party success." *Ibid.* The Court concluded that what Mr. Poole had done was within the power of Congress and the Executive to prevent.

We unhesitatingly reaffirm the *Mitchell* holding that Congress had, and has, the power to prevent Mr. Poole and others like him from holding a party office, working at the polls, and acting as party paymaster for other party workers. An Act of Congress going no farther would in our view unquestionably be valid. So would it be if, in plain and understandable language, the statute forbade activities such as organizing a political party or club; actively participating in fund-raising activities for a partisan candidate or political party; becoming a partisan candidate for, or campaigning for, an elective public office; actively managing the campaign of a partisan candidate for public office; initiating or circulating a partisan nominating petition or soliciting votes for a partisan candidate for public office; or serving as a delegate, alternate or proxy to a political party convention. Our judgment is that neither the First Amendment nor any other provision of the Constitution invalidates a law barring this kind of partisan political conduct by federal employees.

## A

Such decision on our part would no more than confirm the judgment of history, a judgment made by this country over the last century that it is in the best interest of the country, indeed essential, that federal service should depend upon meritorious performance rather than political service, and that the political influence of federal employees on others and on the electoral process should be limited. That this judgment eventuated is indisputable, and the major steps in reaching it may be simply and briefly set down.

Early in our history, Thomas Jefferson was disturbed by the political activities of some of those in the Executive Branch of the Government. See 10 J. Richardson, Messages and Papers of the Presidents 98 (1899). The heads of the executive departments, in response to his directive, issued an order stating in part that "[t]he right of any officer to give his vote at elections as a qualified citizen is not meant to be restrained, nor, however given, shall it have any effect to his prejudice; but it is expected that he will not attempt to influence the votes of others nor take any part in the business of electioneering, that being deemed inconsistent with the spirit of the Constitution and his duties to it." *Id.,* at 98–99.[5]

There were other voices raised in the 19th century against the mixing of partisan politics and routine federal service. But until after the Civil War, the spoils system under which federal employees came and went, depending upon party service and changing administrations, rather than meritorious performance, was much the vogue and the prevalent basis for governmental em-

---

[5] Senator Hatch quoted from this order in the debate on the 1940 amendments to the Hatch Act, 86 Cong. Rec. 2433–2434.

ployment and advancement. 1 Report of Commission on Political Activity of Government Personnel, Findings and Recommendations 7–8 (1968). That system did not survive. Congress authorized the President to prescribe regulations for the creation of a civil service of federal employees in 1871, 16 Stat. 514; but it was the Civil Service Act of 1883, c. 27, 22 Stat. 403, known as the Pendleton Act, H. Kaplan, The Law of Civil Service 9–10 (1958), that declared that "no person in the public service is for that reason under any obligations to contribute to any political fund, or to render any political service" and that "no person in said service has any right to use his official authority or influence to coerce the political action of any person or body." 22 Stat. 404. That Act authorized the President to promulgate rules to carry the Act into effect and created the Civil Service Commission as the agency or administrator of the Act under the rules of the President.

The original Civil Service rules were promulgated on May 7, 1883, by President Arthur. Civil Service Rule I repeated the language of the Act that no one in the executive service should use his official authority or influence to coerce any other person or to interfere with an election, but went no further in restricting the political activities of federal employees. 8 J. Richardson, Messages and Papers of the Presidents 161 (1899). Problems with political activity continued to arise, Twenty-fourth Annual Report of the Civil Service Commission 7–9 (1908),[6] and one form of remedial action was taken in 1907 when, in accordance with Executive Order 642 issued by President Theodore Roosevelt, 1 Report of Commis-

---

[6] In 1886, for example, President Cleveland, through an Executive Order, warned federal employees "against the use of their official positions in attempts to control political movements in their localities." 8 J. Richardson, Messages and Papers of the Presidents 494 (1899).

sion on Political Activity, *supra,* at 9, § 1 of Rule I was amended to read as follows:

"No person in the Executive civil service shall use his official authority or influence for the purpose of interfering with an election or affecting the result thereof. *Persons who, by the provisions of these rules are in the competitive classified service, while retaining the right to vote as they please and to express privately their opinions on all political subjects, shall take no active part in political management or in political campaigns.*" Twenty-fourth Annual Report of the Civil Service Commission, *supra,* at 104 (emphasis added).

It was under this rule that the Commission thereafter exercised the authority it had to investigate, adjudicate, and recommend sanctions for federal employees thought to have violated the rule. See Howard, Federal Restrictions on the Political Activity of Government Employees, 35 Am. Pol. Sci. Rev. 470, 475 (1941). In the course of these adjudications, the Commission identified and developed a body of law with respect to the conduct of federal employees that was forbidden by the prohibition against taking an active part in political management or political campaigning. Adjudications under Civil Service Rule I spelled out the scope and meaning of the rule in the mode of the common law, 86 Cong. Rec. 2341–2342; and the rules fashioned in this manner were from time to time stated and restated by the Commission for the guidance of the federal establishment. Civil Service Form 1236 of September 1939, for example, purported to publish and restate the law of "Political Activity and Political Assessments" for federal officeholders and employees.

Civil Service Rule I covered only the classified service. The experience of the intervening years, particularly that

of the 1936 and 1938 political campaigns, convinced a majority in Congress that the prohibition against taking an active part in political management and political campaigns should be extended to the entire federal service. 84 Cong. Rec. 4303, 9595, 9604, and 9610. A bill introduced for this purpose, S. 1871, "to prevent pernicious political activities," easily passed the Senate, 84 Cong. Rec. 4191–4192; but both the constitutionality and the advisability of purporting to restrict the political activities of employees were heatedly debated in the House. *Id.,* at 9594–9639. The bill was enacted, however. 53 Stat. 1147. This was the so-called Hatch Act, named after the Senator who was its chief proponent. In its initial provisions, §§ 1 and 2, it forbade anyone from coercing or interfering with the vote of another person and prohibited federal employees from using their official positions to influence or interfere with or affect the election or nomination of certain federal officials. Sections 3 and 4 of the Act prohibited the promise of, or threat of termination of, employment or compensation for the purpose of influencing or securing political activity, or support or opposition for any candidate.

Section 9 (a), which provided the prohibition against political activity now found in 5 U. S. C. § 7324 (a)(2), with which we are concerned in this case, essentially restated Civil Service Rule I, with an important exception. It made it

> "unlawful for any person employed in the executive branch of the Federal Government, or any agency or department thereof, to use his official authority or influence for the purpose of interfering with an election or affecting the result thereof. No officer or employee in the executive branch of the Federal Government, or any agency or department thereof, shall take any active part in political management or

in political campaigns. All such persons shall retain the right to vote as they may choose and to express their opinions on all political subjects."

Excepted from the restriction were the President, Vice President, and specified officials in policy-making positions. Section 9 (b) required immediate removal for violators and forbade the use of appropriated funds thereafter to pay compensation to such persons.

Section 9 differed from Civil Service Rule I in important respects. It applied to all persons employed by the Federal Government, with limited exceptions; it made dismissal from office mandatory upon an adjudication of a violation; and, whereas Civil Service Rule I had stated that persons retained the right to express their private opinions on all political subjects, the statute omitted the word "private" and simply privileged all employees "to express their opinions on all political subjects."

On the day prior to signing the bill, President Franklin Roosevelt sent a message to Congress stating his conviction that the bill was constitutional and recommending that Congress at its next session consider extending the Act to state and local government employees. 84 Cong. Rec. 10745–10747 and 10875. This, Congress quickly proceeded to do. The Act of July 19, 1940, c. 640, 54 Stat. 767, extended the Hatch Act to officers and employees of state and local agencies "whose principal employment is in connection with any activity which is financed in whole or in part by loans or grants made by the United States . . . ." The Civil Service Commission was empowered under § 12 (b) to investigate and adjudicate violations of the Act by state and local employees. Also relevant for present purposes, § 9 (a) of the Hatch Act was amended so that all persons covered by the Act were free to "express their opinions on all political subjects *and candidates*." (Emphasis

added.) Moreover, § 15 defined § 9 (a)'s prohibition against taking an active part in political management or in political campaigns as proscribing "the same activities on the part of such persons as the United States Civil Service Commission has heretofore determined are at the time this section takes effect prohibited on the part of employees in the classified civil service of the United States by the provisions of the civil-service rules prohibiting such employees from taking any active part in political management or in political campaigns." Under § 18, now 5 U. S. C. § 7326, the prohibition against political activity was not to be construed to prohibit political activity in nonpartisan elections or in connection with questions not specifically identified with any national or state political party, such as "questions relating to constitutional amendments, referendums, approval of municipal ordinances, and others of a similar character . . . ." [7]

In 1950, § 9 (b), of the Act, requiring removal from office for violating the Act, was amended by providing that the Commission by unanimous vote could impose a lesser penalty, but in no case less than 90 days' suspension without pay. 64 Stat. 475. The minimum sanction was reduced to 30 days' suspension without pay in 1962. 76 Stat. 750.

In 1966, Congress determined to review the restrictions of the Hatch Act on the partisan political activities of public employees. For this purpose, the Commission on Political Activity of Government Personnel was created.

---

[7] The 1940 amendments to the Hatch Act, 54 Stat. 767–772, also provided, inter alia, for a limitation on certain campaign contributions, § 13; for federal employees in municipalities in the vicinity of the District of Columbia, with the approval of the Commission, to engage in political activity, § 16; and for a limitation on receipts and expenditures of political committees, § 20.

80 Stat. 868. The Commission reported in 1968, recommending some liberalization of the political-activity restrictions on federal employees, but not abandoning the fundamental decision that partisan political activities by government employees must be limited in major respects. 1 Report of Commission on Political Activity of Government Personnel, *supra*. Since that time, various bills have been introduced in Congress, some following the Commission's recommendations[8] and some proposing much more substantial revisions of the Hatch Act.[9] In 1972, hearings were held on some proposed legislation; but no new legislation has resulted.[10]

This account of the efforts by the Federal Government to limit partisan political activities by those covered by the Hatch Act should not obscure the equally relevant fact that all 50 States have restricted the political activities of their own employees.[11]

---

[8] H. R. 2372, 91st Cong., 1st Sess.; S. 2032, 92d Cong., 1st Sess.; S. 3417, 92d Cong., 2d Sess.; S. 235, 93d Cong., 1st Sess. For the legislation recommended by the Commission on Political Activity, see 1 Report of Commission on Political Activity of Government Personnel, Findings and Recommendations 44–60 (1968).

[9] H. R. 19214, 91st Cong., 2d Sess.; H. R. 914, 92d Cong., 1st Sess.; S. 3374, 92d Cong., 2d Sess.; H. R. 668, S. 350, 93d Cong., 1st Sess.

[10] Hearings on S. 3374 and S. 3417 before the Senate Committee on Post Office and Civil Service, 92d Cong., 2d Sess. Congress has extended the restrictions on political activity to persons not previously covered. The Economic Opportunity Act of 1964, § 603, 78 Stat. 530, as amended, 42 U. S. C. § 2943, extended the restrictions to certain employees of private corporations; the Postal Reorganization Act, 84 Stat. 719, 39 U. S. C. § 410, made the provisions applicable to the Postal Service; and the Emergency Employment Act of 1971, § 12 (h), 85 Stat. 154, 42 U. S. C. § 4881 (h) (1970 ed., Supp. I), extended the provisions to personnel employed in the administration of programs established under the Act.

[11] See generally *Broadrick* v. *Oklahoma, post*, p. 601, and *id.*, at 604–605, n. 2.

## B

Until now, the judgment of Congress, the Executive, and the country appears to have been that partisan political activities by federal employees must be limited if the Government is to operate effectively and fairly, elections are to play their proper part in representative government, and employees themselves are to be sufficiently free from improper influences. *E. g.,* 84 Cong. Rec. 9598, 9603; 86 Cong. Rec. 2360, 2621, 2864, 9376. The restrictions so far imposed on federal employees are not aimed at particular parties, groups, or points of view, but apply equally to all partisan activities of the type described. They discriminate against no racial, ethnic, or religious minorities. Nor do they seek to control political opinions or beliefs, or to interfere with or influence anyone's vote at the polls.

But, as the Court held in *Pickering* v. *Board of Education,* 391 U. S. 563, 568 (1968), the government has an interest in regulating the conduct and "the speech of its employees that differ[s] significantly from those it possesses in connection with regulation of the speech of the citizenry in general. The problem in any case is to arrive at a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the [government], as an employer, in promoting the efficiency of the public services it performs through its employees." Although Congress is free to strike a different balance than it has, if it so chooses, we think the balance it has so far struck is sustainable by the obviously important interests sought to be served by the limitations on partisan political activities now contained in the Hatch Act.

It seems fundamental in the first place that employees in the Executive Branch of the Government, or those working for any of its agencies, should administer the law

in accordance with the will of Congress, rather than in accordance with their own or the will of a political party. They are expected to enforce the law and execute the programs of the Government without bias or favoritism for or against any political party or group or the members thereof. A major thesis of the Hatch Act is that to serve this great end of Government—the impartial execution of the laws—it is essential that federal employees, for example, not take formal positions in political parties, not undertake to play substantial roles in partisan political campaigns, and not run for office on partisan political tickets. Forbidding activities like these will reduce the hazards to fair and effective government. See 84 Cong. Rec. 9598; 86 Cong. Rec. 2433–2434, 2864; Hearings on S. 3374 and S. 3417 before the Senate Committee on Post Office and Civil Service, 92d Cong., 2d Sess., 171.

There is another consideration in this judgment: it is not only important that the Government and its employees in fact avoid practicing political justice, but it is also critical that they appear to the public to be avoiding it, if confidence in the system of representative Government is not to be eroded to a disastrous extent.

Another major concern of the restriction against partisan activities by federal employees was perhaps the immediate occasion for enactment of the Hatch Act in 1939. That was the conviction that the rapidly expanding Government work force should not be employed to build a powerful, invincible, and perhaps corrupt political machine. The experience of the 1936 and 1938 campaigns convinced Congress that these dangers were sufficiently real that substantial barriers should be raised against the party in power—or the party out of power, for that matter—using the thousands or hundreds of thousands of federal employees, paid for at public expense, to man its

political structure and political campaigns. *E. g.,* 84 Cong. Rec. 9595, 9598, 9604, 9610.

A related concern, and this remains as important as any other, was to further serve the goal that employment and advancement in the Government service not depend on political performance, and at the same time to make sure that Government employees would be free from pressure and from express or tacit invitation to vote in a certain way or perform political chores in order to curry favor with their superiors rather than to act out their own beliefs. See, *e. g., id.,* at 9598, 9603; 86 Cong. Rec. 2433–2434; Hearings on S. 3374 and S. 3417, *supra,* at 171. It may be urged that prohibitions against coercion are sufficient protection; but for many years the joint judgment of the Executive and Congress has been that to protect the rights of federal employees with respect to their jobs and their political acts and beliefs it is not enough merely to forbid one employee to attempt to influence or coerce another.[12] For example, at the hearings in 1972 on proposed legislation for liberalizing the prohibition against political activity, the Chairman of the Civil Service Commission stated that "the prohibitions against active participation in partisan political

---

[12] In the 1940 debate over amendments to the Hatch Act, it was frequently stated that the only objectionable provisions were those restrictions in § 9 and the proposed § 12 against voluntary political activity, see, *e. g.,* 86 Cong. Rec. 2626, 2696, 2700, 2708, 2722. In response to the inquiry whether he was condemning those "who, without any coercion, voluntarily desire to take a part in politics," Senator Hatch replied that he "would draw the line if it could be drawn; but I defy . . . [anyone] to draw that line." *Id.,* at 2626. During the 1967 hearings before the Commission on Political Activity the then Chairman of the Civil Service Commission noted that "one man's coercion is another man's persuasion," and that "in an employer/employee relationship, the extent of voluntaryism tends to be rather substantially circumscribed." 3 Report of Commission on Political Activity of Government Personnel, Hearings, 759 (1968).

management and partisan political campaigns constitute the most significant safeguards against coercion . . . ." Hearings on S. 3374 and S. 3417, *supra*, at 52. Perhaps Congress at some time will come to a different view of the realities of political life and Government service; but that is its current view of the matter, and we are not now in any position to dispute it. Nor, in our view, does the Constitution forbid it.

Neither the right to associate nor the right to participate in political activities is absolute in any event. See, *e. g.*, *Rosario* v. *Rockefeller*, 410 U. S. 752 (1973); *Dunn* v. *Blumstein*, 405 U. S. 330, 336 (1972); *Bullock* v. *Carter*, 405 U. S. 134, 140–141 (1972); *Jenness* v. *Fortson*, 403 U. S. 431 (1971); *Williams* v. *Rhodes*, 393 U. S. 23, 30–31 (1968). Nor are the management, financing, and conduct of political campaigns wholly free from governmental regulation.[13] We agree with the basic holding of *Mitchell* that plainly identifiable acts of political management and political campaigning on the part of federal employees may constitutionally be prohibited. Until now this has been the judgment of the lower federal courts,[14] and we do not understand the District Court in this case to have questioned the constitutionality of a law that was specifically limited to prohibiting the conduct in which Mr. Poole in the *Mitchell* case admittedly engaged.

---

[13] See, *e. g.*, 18 U. S. C. § 594 (intimidation of voters); § 597 (expenditures to influence voting); § 602 (solicitation of political contributions); and § 612 (publication or distribution of political statements).

[14] See, *e. g.*, *Northern Virginia Regional Park Authority* v. *U. S. Civil Service Comm'n*, 437 F. 2d 1346 (CA4), cert. denied, 403 U. S. 936 (1971); *Fishkin* v. *U. S. Civil Service Comm'n*, 309 F. Supp. 40 (ND Cal. 1969), appeal dismissed as untimely, 396 U. S. 278 (1970); *Kearney* v. *Macy*, 409 F. 2d 847 (CA9 1969), cert. denied, 397 U. S. 943 (1970); *Engelhardt* v. *U. S. Civil Service Comm'n*, 197 F. Supp. 806 (MD Ala. 1961), aff'd *per curiam*, 304 F. 2d 882 (CA5 1962).

## III

But however constitutional the proscription of identi-
fiable partisan conduct in understandable language may
be, the District Court's judgment was that § 7324 (a)(2)
was both unconstitutionally vague and fatally overbroad.
Appellees make the same contentions here, but we can-
not agree that the section is unconstitutional on its face
for either reason.

As an initial matter, we must have clearly in mind the
statutory prohibitions that we are examining for imper-
missible vagueness and overbreadth.

Section 7324 (a)(2) provides that an employee in an
executive agency must not take "an active part in politi-
cal management or in political campaigns" and goes on
to say that this prohibition refers to "those acts of politi-
cal management or political campaigning which were pro-
hibited on the part of employees in the competitive
service before July 19, 1940, by determinations of the
Civil Service Commission under the rules prescribed by the
President." Section 7324 (b) privileges an employee to
vote as he chooses and to express his opinion on political
subjects and candidates, and §§ 7324 (c) and (d), as well
as § 7326, also limit the applicability of § 7324 (a)(2).[15]

---

[15] Title 5 U. S. C. § 7324 provides:

"(a) An employee in an Executive agency or an individual em-
ployed by the government of the District of Columbia may not—

"(1) use his official authority or influence for the purpose of
interfering with or affecting the result of an election; or

"(2) take an active part in political management or in political
campaigns.

"For the purpose of this subsection, the phrase 'an active part in
political management or in political campaigns' means those acts
of political management or political campaigning which were pro-
hibited on the part of employees in the competitive service before
July 19, 1940, by determinations of the Civil Service Commission
under the rules prescribed by the President.

"(b) An employee or individual to whom subsection (a) of this

The principal issue with respect to this statutory scheme is what Congress intended when it purported to define "an active part in political management or in political campaigns," as meaning the prior interpretations by the Civil Service Commission under Civil Service Rule I which contained the identical prohibition.

---

section applies retains the right to vote as he chooses and to express his opinion on political subjects and candidates.

"(c) Subsection (a) of this section does not apply to an individual employed by an educational or research institution, establishment, agency, or system which is supported in whole or in part by the District of Columbia or by a recognized religious, philanthropic, or cultural organization.

"(d) Subsection (a)(2) of this section does not apply to—

"(1) an employee paid from the appropriation for the office of the President;

"(2) the head or the assistant head of an Executive department or military department;

"(3) an employee appointed by the President, by and with the advice and consent of the Senate, who determines policies to be pursued by the United States in its relations with foreign powers or in the nationwide administration of Federal laws;

"(4) the Commissioners of the District of Columbia; or

"(5) the Recorder of Deeds of the District of Columbia."

Title 5 U. S. C. § 7326 states:

"Section 7324 (a)(2) of this title does not prohibit political activity in connection with—

"(1) an election and the preceding campaign if none of the candidates is to be nominated or elected at that election as representing a party any of whose candidates for presidential elector received votes in the last preceding election at which presidential electors were selected; or

"(2) a question which is not specifically identified with a National or State political party or political party of a territory or possession of the United States.

"For the purpose of this section, questions relating to constitutional amendments, referendums, approval of municipal ordinances, and others of a similar character, are deemed not specifically identified with a National or State political party or political party of a territory or possession of the United States."

Earlier in this opinion it was noted that this definition was contained in § 15 of the 1940 Act. As recommended by the Senate Committee, S. Rep. No. 1236, 76th Cong., 3d Sess., 2, 4, § 15 conferred broad rulemaking authority on the Civil Service Commission to spell out the meaning of "an active part in political management or in political campaigns." [16] There were, in any event, strong objections to extending the Hatch Act to those state employees working in federally financed programs, see, *e. g.*, 86 Cong. Rec. 2486, 2793–2794, 2801–2802, and to § 15, in particular, as being an unwise and invalid delegation of legislative power to the Commission. See, *e. g.*, *id.*, at 2352, 2426–2427, 2579, 2794, 2875. The matter was vigorously debated; and ultimately Senator Hatch, the principal proponent and manager of the bill, offered a substitute for § 15, *id.*, at 2928 and 2937, limiting the reach of the prohibition to those same activities that the Commission "has heretofore determined are at the time of the passage of this act prohibited on the part of employees" in the classified service by the similar provision in Civil Service Rule I.[17] The matter was further de-

---

[16] Section 15, as reported out of the Senate Committee, provided:

"SEC. 15. The United States Civil Service Commission is hereby authorized and directed to promulgate, as soon as practicable, rules or regulations defining, for the purposes of this act, the term 'active part in political management or in political campaigns.' After the promulgation of such rules or regulations, the term 'active part in political management or in political campaigns,' as used in this act, shall have the meaning ascribed to it by such rules or regulations. The Commission is authorized to amend such rules or regulations from time to time as it deems necessary." 86 Cong. Rec. 2352.

[17] The substitute for the section recommended by the Committee provided:

"SEC. 15. The provisions of this act which prohibit persons to whom such provisions apply from taking any active part in political management or in political campaigns shall be deemed to prohibit

bated, and the amendment carried.   *Id.,* at 2958–2959.

The District Court and appellees construe § 15, now part of § 7324 (a)(2), as incorporating each of the several thousand adjudications of the Civil Service Commission under Civil Service Rule I, many of which are said to be undiscoverable, inconsistent, or incapable of yielding any meaningful rules to govern present or future conduct. In any event, the District Court held the prohibition against taking an active part in political management and political campaigns to be itself an insufficient guide to employee behavior and thought the definitional addendum of § 15 only compounded the confusion by referring the concerned employees to an impenetrable jungle of Commission proceedings, orders, and rulings.   346 F. Supp., at 582–583, 585.

We take quite a different view of the statute.   As we see it, our task is not to destroy the Act if we can, but to construe it, if consistent with the will of Congress, so as to comport with constitutional limitations.   With this in mind and having examined with some care the proceedings surrounding the passage of the 1940 Act and adoption of the substitute for § 15, we think it appears plainly enough that Congress intended to deprive the Civil Service Commission of rulemaking power in the sense of exercising a subordinate legislative role in fashioning a more expansive definition of the kind of con-

---

the same activities on the part of such persons as the United States Civil Service Commission has heretofore determined *are at the time of the passage of this act* prohibited on the part of employees in the classified civil service of the United States by the provisions of the civil-service rules prohibiting such employees from taking any active part in political management or in political campaigns." 86 Cong. Rec. 2937 (emphasis added).

After the substitute was introduced, *id.,* at 2928, Senator Hatch made a "slight modification," *id.,* at 2937, and added the phrase in italics above.

duct that would violate the prohibition against taking an active part in political management or political campaigns. But it is equally plain, we think, that Congress accepted the fact that the Commission had been performing its investigative and adjudicative role under Civil Service Rule I since 1907 and that the Commission had, on a case-by-case basis, fleshed out the meaning of Rule I and so developed a body of law with respect to what partisan conduct by federal employees was forbidden by the rule. 86 Cong. Rec. 2342, 2353. It is also apparent, in our view, that the rules that had evolved over the years from repeated adjudications were subject to sufficiently clear and summary statement for the guidance of the classified service. Many times during the debate on the floor of the Senate, Senator Hatch and others referred to a summary list of such prohibitions, see, e. g., id., at 2929, 2937–2938, 2942–2943, 2949, 2952–2953, the Senator's ultimate reference being to Civil Service Form No. 1236 of September 1939, the pertinent portion of which he placed in the Record, id., at 2938–2940,[18] and which was the Commission's then-current effort to restate the prevailing prohibitions of Civil

[18] See Appendix to this opinion, infra, p. 581. Senator Hatch did not have Form 1236 with him on the floor during debate on § 15 and provided the pertinent portion from the Form for insertion into the Congressional Record after debate had been completed on the section. 86 Cong. Rec. 2938–2940. However, the Senator had provided the Senate with a card listing 18 rules which were described as the Civil Service Commission's construction of Civil Service Rule I, id., at 2937–2938, 2943. The card, prepared by Senator Hatch with assistance from the Commission, was a summary of pertinent portions of Form 1236, id., at 2937–2938, and was inserted into the Congressional Record, id., at 2943. It provided:

"The pertinent language in section 9 is practically a duplication of the civil-service rule prohibiting political activity of employees under the classified civil service.

"The section provides in substance, among other things, that no

Service Rule I, as spelled out in its adjudications to that date. It was this administrative restatement of Civil Service Rule I law, modified to the extent necessary to reflect the provisions of the 1939 and 1940 Acts them-

---

such officer or employee shall take any active part in political management or in political campaigns.

"The same language of the civil-service rule has been construed as follows:

"1. Rule prohibits participation not only in national politics but also in State, county, and municipal politics.

"2. Temporary employees, substitutes, and persons on furlough or leave of absence with or without pay are subject to the regulation.

"3. Whatever an official or employee may not do directly he may not do indirectly or through another.

"4. Candidacy for or service as delegate, alternate, or proxy in any political convention is prohibited.

"5. Service for or on any political committee is prohibited.

"6. Organizing or conducting political rallies or meetings or taking any part therein except as a spectator is prohibited.

"7. Employees may express their opinions on all subjects, but they may not make political speeches.

"8. Employees may vote as they please, but they must not solicit votes; mark ballots for others; help to get out votes; act as checkers, marker, or challenger for any party or engage in other activity at the poles [sic] except the casting of his own ballot.

"9. An employee may not serve as election official unless his failure or refusal so to do would be a violation of State laws.

"10. It is political activity for an employee to publish or be connected editorially, managerially, or financially with any political newspaper. An employee may not write for publication or publish any letter or article signed or unsigned in favor of or against any political party, candidate, or faction.

"11. Betting or wagering upon the results of a primary or general election is political activity.

"12. Organization or leadership of political parades is prohibited but marching in such parades is not prohibited.

"13. Among other forms of political activity which are prohibited are distribution of campaign literature, assuming political leadership, and becoming prominently identified with political move-

selves, that, in our view, Congress intended to serve as its definition of the general proscription against partisan activities.[19] It was within the limits of these rules that the Civil Service Commission was to proceed to perform its role under the statute.

Not only did Congress expect the Commission to continue its accustomed role with respect to federal employees, but also in § 12 (b) of the 1940 Act Congress expressly assigned the Commission the enforcement task with respect to state employees now covered by the Act.

---

ments, parties, or factions or with the success or failure of supporting any candidate for public office.

"14. Candidacy for nomination or for the election to any National, State, county, or municipal office is within the prohibition.

"15. Attending conventions as spectators is permitted.

"16. An employee may attend a mass convention or caucus and cast his vote, but he may not pass this point.

"17. Membership in a political club is permitted, but employees may not be officers of the club nor act as such.

"18. Voluntary contributions to campaign committees and organizations are permitted. An employee may not solicit, collect, or receive contributions. Contributions by persons receiving remuneration from funds appropriated for relief purposes are not permitted."

[19] That § 15's incorporation of the Civil Service Commission restatement was intended to include only those Commission interpretations consistent with the Hatch Act is demonstrated by the following colloquy between Senators Hatch and Minton, 86 Cong. Rec. 2871:

"Mr. MINTON. The right to express political opinions has been defined by the Civil Service Commission to mean the private expression of such opinions.

"Mr. HATCH: Yes; the word 'privately' is in the rule of the Civil Service Commission. It is not in . . . [§ 9 of the Hatch Act].

"Mr. MINTON. The Civil Service Commission has defined the right to express political opinions as the right to do so privately.

"Mr. HATCH. Mr. President, that is because the word 'privately' is included in the rule of the Civil Service Commission. The word 'privately' is written into the rule. That is the word which I dropped out. I did it deliberately, intentionally, and I want it to remain out."

The Commission was to issue notice, hold hearings, adjudicate, and enforce. This process, inevitably and predictably, would entail further development of the law within the bounds of, and necessarily no more severe than, the 1940 rules and would be productive of a more refined definition of what conduct would or would not violate the statutory prohibition of taking an active part in political management and political campaigns.

It is thus not surprising that there were later editions of Form 1236,[20] or that in 1970 the Commission again purported to restate the law of forbidden political activity and, informed by years of intervening adjudications, again sought to define those acts which are forbidden and those which are permitted by the Hatch Act. These regulations, 5 CFR pt. 733, are wholly legitimate descendants of the 1940 restatement adopted by Congress and were arrived at by a process that Congress necessarily anticipated would occur down through the years. We accept them as the current and, in most respects, the longstanding interpretations of the statute by the agency charged with its interpretation and enforcement. It is to these regulations purporting to construe § 7324 as actually applied in practice, as well as to the statute itself, with its various exclusions, that we address ourselves in rejecting the claim that the Act is unconstitutionally vague and overbroad. *Law Students Research Council* v. *Wadmond,* 401 U. S. 154, 162–163 (1971); cf. *Gooding* v. *Wilson,* 405 U. S. 518, 520–521 (1972).

Whatever might be the difficulty with a provision against taking "active part in political management or in political campaigns," the Act specifically provides that the employee retains the right to vote as he chooses

---

[20] 1942, 1944, and 1966, the title being changed in the 1966 edition to Political Activity.

and to express his opinion on political subjects and candidates. The Act exempts research and educational activities supported by the District of Columbia or by religious, philanthropic, or cultural organizations, 5 U. S. C. § 7324 (c); and § 7326 exempts nonpartisan political activity: questions, that is, that are not identified with national or state political parties are not covered by the Act, including issues with respect to constitutional amendments, referendums, approval of municipal ordinances, and the like. Moreover, the plain import of the 1940 amendment to the Hatch Act is that the proscription against taking an active part in the proscribed activities is not open-ended but is limited to those rules and proscriptions that had been developed under Civil Service Rule I up to the date of the passage of the 1940 Act. Those rules, as refined by further adjudications within the outer limits of the 1940 rules, were restated by the Commission in 1970 in the form of regulations specifying the conduct that would be prohibited or permitted by § 7324 and its companion sections.

We have set out these regulations in the margin.[21] We

---

[21] The pertinent regulations, appearing in 5 CFR.pt. 733, provide:

"PERMISSIBLE ACTIVITIES

"§ 733.111 Permissible activities.

"(a) All employees are free to engage in political activity to the widest extent consistent with the restrictions imposed by law and this subpart. Each employee retains the right to—

"(1) Register and vote in any election;

"(2) Express his opinion as an individual privately and publicly on political subjects and candidates;

"(3) Display a political picture, sticker, badge, or button;

"(4) Participate in the nonpartisan activities of a civic, community, social, labor, or professional organization, or of a similar organization;

"(5) Be a member of a political party or other political organiza-

see nothing impermissibly vague in 5 CFR § 733.122, which specifies in separate paragraphs the various activities deemed to be prohibited by § 7324 (a)(2). There

tion and participate in its activities to the extent consistent with law;

"(6) Attend a political convention, rally, fund-raising function; or other political gathering;

"(7) Sign a political petition as an individual;

"(8) Make a financial contribution to a political party or organization;

"(9) Take an active part, as an independent candidate, or in support of an independent candidate, in a partisan election covered by § 733.124;

"(10) Take an active part, as a candidate or in support of a candidate, in a nonpartisan election;

"(11) Be politically active in connection with a question which is not specifically identified with a political party, such as a constitutional amendment, referendum, approval of a municipal ordinance or any other question or issue of a similar character;

"(12) Serve as an election judge or clerk, or in a similar position to perform nonpartisan duties as prescribed by State or local law; and

"(13) Otherwise participate fully in public affairs, except as prohibited by law, in a manner which does not materially compromise his efficiency or integrity as an employee or the neutrality, efficiency, or integrity of his agency.

"(b) Paragraph (a) of this section does not authorize an employee to engage in political activity in violation of law, while on duty, or while in a uniform that identifies him as an employee. The head of an agency may prohibit or limit the participation of an employee or class of employees of his agency in an activity permitted by paragraph (a) of this section, if participation in the activity would interfere with the efficient performance of official duties, or create a conflict or apparent conflict of interests.

"PROHIBITED ACTIVITIES

"§ 733.121 Use of official authority; prohibition.

"An employee may not use his official authority or influence for the purpose of interfering with or affecting the result of an election.

"§ 733.122 Political management and political campaigning; prohibitions.

"(a) An employee may not take an active part in political man-

might be quibbles about the meaning of taking an "active part in managing" or about "actively participating in . . . fund-raising" or about the meaning of becoming a "partisan" candidate for office; but there are limitations in the English language with respect to being both spe-

agement or in a political campaign, except as permitted by this subpart.

"(b) Activities prohibited by paragraph (a) of this section include but are not limited to—

"(1) Serving as an officer of a political party, a member of a National, State, or local committee of a political party, an officer or member of a committee of a partisan political club, or being a candidate for any of these positions;

"(2) Organizing or reorganizing a political party organization or political club;

"(3) Directly or indirectly soliciting, receiving, collecting, handling, disbursing, or accounting for assessments, contributions, or other funds for a partisan political purpose;

"(4) Organizing, selling tickets to, promoting, or actively participating in a fund-raising activity of a partisan candidate, political party, or political club;

"(5) Taking an active part in managing the political campaign of a partisan candidate for public office or political party office;

"(6) Becoming a partisan candidate for, or campaigning for, an elective public office;

"(7) Soliciting votes in support of or in opposition to a partisan candidate for public office or political party office;

"(8) Acting as recorder, watcher, challenger, or similar officer at the polls on behalf of a political party or partisan candidate;

"(9) Driving voters to the polls on behalf of a political party or partisan candidate;

"(10) Endorsing or opposing a partisan candidate for public office or political party office in a political advertisement, a broadcast, campaign literature, or similar material;

"(11) Serving as a delegate, alternate, or proxy to a political party convention;

"(12) Addressing a convention, caucus, rally, or similar gathering of a political party in support of or in opposition to a partisan candidate for public office or political party office; and

"(13) Initiating or circulating a partisan nominating petition."

cific and manageably brief, and it seems to us that although the prohibitions may not satisfy those intent on finding fault at any cost, they are set out in terms that the ordinary person exercising ordinary common sense can sufficiently understand and comply with, without sacrifice to the public interest. "[T]he general class of offenses to which . . . [the provisions are] directed is plainly within [their] terms, . . . [and they] will not be struck down as vague, even though marginal cases could be put where doubts might arise." *United States* v. *Harriss,* 347 U. S. 612, 618 (1954). Surely, there seemed to be little question in the minds of the plaintiffs who brought this lawsuit as to the meaning of the law, or as to whether or not the conduct in which they desire to engage was or was not prohibited by the Act.

The Act permits the individual employee to "express his opinion on political subjects and candidates," 5 U. S. C. § 7324 (b); and the corresponding regulation, 5 CFR § 733.111 (a)(2), privileges the employee to "[e]xpress his opinion as an individual privately and publicly on political subjects and candidates." The section of the regulations which purports to state the partisan acts that are proscribed, *id.,* § 733.122, forbids in subparagraph (a)(10) the endorsement of "a partisan candidate for public office or political party office in a political advertisement, a broadcast, campaign literature, or similar material," and in subparagraph (a)(12), prohibits "[a]ddressing a convention, caucus, rally, or similar gathering of a political party in support of or in opposition to a partisan candidate for public office or political party office." Arguably, there are problems in meshing § 733.111 (a)(2) with §§ 733.122 (a)(10) and (12), but we think the latter prohibitions sufficiently clearly carve out the prohibited political conduct from the expressive activity permitted by the prior section to survive any

attack on the ground of vagueness or in the name of any of those policies that doctrine may be deemed to further.

It is also important in this respect that the Commission has established a procedure by which an employee in doubt about the validity of a proposed course of conduct may seek and obtain advice from the Commission and thereby remove any doubt there may be as to the meaning of the law, at least insofar as the Commission itself is concerned.[22]

Neither do we discern anything fatally overbroad about the statute when it is considered in connection with the Commission's construction of its terms represented by the 1970 regulations we now have before us. The major difficulties in this respect again relate to the prohibition in §§ 733.122 (a)(10) and (12) on endorsements in advertisements, broadcasts, and literature and on speaking at political party meetings in support of partisan candidates for public or party office. But these restrictions are clearly stated, they are political acts normally performed only in the context of partisan campaigns by one taking an active role in them, and they are sustainable for the same reasons that the other acts of political campaigning are constitutionally proscribable. They do not, therefore, render the remainder of the statute vulnerable by reason of overbreadth.

Even if the provisions forbidding partisan campaign endorsements and speechmaking were to be considered in some respects unconstitutionally overbroad, we would not invalidate the entire statute as the District Court did. The remainder of the statute, as we have said,

---

[22] According to an affidavit filed in District Court by the General Counsel for the Civil Service Commission, App. 54:

"The Information Unit [in the Office of General Counsel] answers inquiries, from whatever source, concerning the application of the Hatch Act, Rule, and regulations."

covers a whole range of easily identifiable and constitutionally proscribable partisan conduct on the part of federal employees, and the extent to which pure expression is impermissibly threatened, if at all, by §§ 733.122 (a) (10) and (12), does not in our view make the statute substantially overbroad and so invalid on its face. *Broadrick* v. *Oklahoma, post,* p. 601.

For the foregoing reasons, the judgment of the District Court is reversed.

*So ordered.*

### APPENDIX TO OPINION OF THE COURT

That portion of the United States Civil Service Commission Form 1236, Political Activity and Assessments, September 1939, as inserted into the Congressional Record by Senator Hatch, 86 Cong. Rec. 2938–2940, provided:

### III. PARTICULAR TYPES OF PROHIBITED ACTIVITIES

11. As has been pointed out, it is impossible to make a complete enumeration of all the particular types of political activities in which Government employees may not engage. The general scope of the political-activity rule has been defined in section 2 above. In the following sections some of the types of political activity which occur more frequently are discussed in detail.

12. Activity by indirection: Any political activity which is prohibited in the case of an employee acting independently is also prohibited in the case of an employee acting in open or secret cooperation with others. Whatever the employee may not do directly or personally, he may not do indirectly or through an agent, officer, or employee chosen by him or subject to his control. Employees are therefore accountable for political activity by persons other than themselves, including

wives or husbands, if, in fact, the employees are thus accomplishing by collusion and indirection what they may not lawfully do directly and openly. Political activity in fact, regardless of the methods or means used by the employee, constitutes the violation.

This does not mean that an employee's husband or wife may not engage in politics independently, upon his or her own initiative, and in his or her own behalf. Cases have arisen, however, in which the facts showed that the real purpose of a wife's activity was to accomplish a political act prohibited to her husband, the attempt being made for her husband's benefit and at his instigation or even upon his coercion. This may be true of individuals or it may occur among groups of employees' wives, associated for the purpose of securing for their husbands what their husbands may not secure for themselves. In such situations it is obvious that the prohibitions against political activity are being indirectly violated. The collusion or coercion renders the wife's activity imputable to the husband, he being guilty of the same infraction as if he were openly a participant.

13. Conventions: Candidacy for or service as delegate, alternate, or proxy in any political convention or service as an officer or employee thereof is prohibited. Attendance merely as a spectator is permissible, but the employee so attending must not take any part in the convention or in the deliberations or proceedings of any of its committees, and must refrain from any public display of partisanship or obtrusive demonstration or interference. (See secs. 4 and 19.)

14. Primaries—caucuses: An employee may attend a primary meeting, mass convention, beat convention, caucus, and the like, and may cast his vote on any question presented, but he may not pass this point in participating in its deliberations. He may not act as an officer of the meeting, convention, or caucus, may not address it, make

motions, prepare or assist in preparing resolutions, assume to represent others, or take any prominent part therein.

15. Committees: Service on or for any political committee or similar organization is prohibited. An employee may attend as a spectator any meeting of a political committee to which the general public is admitted, but must refrain from activity as indicated in the preceding paragraphs.

Whether a committee has an ultimate political purpose determines whether a classified employee may properly serve as a member. Assignment may be to duties which, if considered alone, would seem far removed from active politics, but which, when considered as a part of the whole purpose, assume an active political character. No attempt can be made to differentiate between workers on or under political committees with respect to the degree to which they are politically active.

16. Clubs and organizations: Employees may be members of political clubs, but it is improper for them to be active in organizing such a club, to be officers of the club, or members or officers of any of its committees or to act as such, or to address a political club. Service as a delegate from such a club to a league of political clubs is service as an officer or representative of a political club and is prohibited, as is service as a delegate or representative of such a club to or in any other organization. In other words, an employee may become a member of a political club, but may not take an active part in its management or affairs, and may not represent other members or attempt to influence them by his actions or utterances. (See secs. 4 and 19.)

Section 6 of the act of August 24, 1912 (37 Stat. 555), provides in part—

"That membership in any society, association, club, or other form of organization of postal employees not affil-

iated with any outside organization imposing an obligation or duty upon them to engage in any strike, or proposing to assist them in any strike, against the United States, having for its objects, among other things, improvements in the condition of labor of its members, including hours of labor and compensation therefor and leave of absence, by any person or groups of persons in said Postal Service, or the presenting by any such person or groups of persons of any grievance or grievances to the Congress or any Member thereof, shall not constitute or be cause for reduction in rank or compensation or removal of such person or groups of persons from said service."

Section 9A of the act of August 2, 1939 (Public, No. 252, 76th Cong.), provides as follows:

"(1) It shall be unlawful for any person employed in any capacity by any agency of the Federal Government, whose compensation, or any part thereof, is paid from funds authorized or appropriated by any act of Congress, to have membership in any political party or organization which advocates the overthrow of our constitutional form of government in the United States.

"(2) Any person violating the provisions of this section shall be immediately removed from the position or office held by him, and thereafter no part of the funds appropriated by any act of Congress for such position or office shall be used to pay the compensation of such person."

17. Contributions: An employee may make political contributions to any committee, organization, or person not employed by the United States, but may not solicit, collect, receive, or otherwise handle or disburse the contributions. (See provisions of the Criminal Code, discussed in secs. 36 to 50.)

18. Meetings: Service in preparing for, organizing, or conducting a political meeting or rally, addressing such

a meeting, or taking any part therein, except as a spectator, is prohibited.

19. Expression of opinions: Although section 9 (a) of the act of August 2, 1939 reserves to Federal officers and employees the right to express their opinions on all political subjects, officers and employees in the competitive classified service are subject also to section 1 of civil-service rule I, under which such employees must confine themselves to a private expression of opinion. Non-classified and excepted employees may not indulge in such public expression of opinion as constitutes taking part in an organized political campaign. (See foregoing secs. 1 and 4.)

20. Activity at the polls and for candidates: An employee has the right to vote as he pleases, and to exercise this right free from interference, solicitation, or dictation by any fellow employee or superior officer or any other person. It is a violation of the Federal Corrupt Practices Act to pay or offer to pay any person for voting or refraining from voting, or for voting for or against any candidate for Senator or Representative in, or Delegate or Resident Commissioner to, Congress. It is also a violation of the law to solicit, receive, or accept payment for one's vote or for withholding one's vote. (See U. S. Code, title 2, sec. 250.)

Under the act of August 2, 1939, it is a criminal offense for any person to intimidate, threaten, or coerce any other person for the purpose of interfering with the right of such other person to vote as he may choose in any election of a national character. It is also a criminal offense to promise any employment, position, work, or compensation, or other benefit made possible by an act of Congress, as a consideration, favor, or reward for political activity or for the support of or opposition to any political candidate or party. (See secs. 48 and 50 herein.)

It is the duty of an employee to avoid any offensive activity at primary and regular elections. He must refrain from soliciting votes, assisting voters to mark ballots, helping to get out the voters on registration and election days, acting as the accredited checker, watcher, or challenger of any party or faction, assisting in counting the vote, or engaging in any other activity at the polls except the marking and depositing of his own ballot. Rendering service, such as transporting voters to and from the polls and candidates on canvassing tours, whether for pay or gratuitously, is held to be within the scope of political activities prohibited by the rule, even if such service is performed without regard to political party.

21. Election officers: Service as judge of election, inspector, checker, teller, or as election officer of any kind is prohibited.

22. Newspapers—publication of letters or articles: A classified employee may not publish or be connected editorially or managerially with any political newspaper, and may not write for publication or publish any letter or article, signed or unsigned, in favor of or against any political party, candidate, faction, or measure. An employee who writes such a letter or article is responsible for any use that may be made of it whether or not he gives consent to such use. (See secs. 4 and 19.)

23. Liquor question: Activity in campaigns concerning the regulation or suppression of the liquor traffic is prohibited. An employee may be a member but not an officer of a club, league, or other organization which takes part in such a campaign. The dissemination of temperance propaganda is permissible, but any endeavor for or against the regulation, control, or suppression of the liquor traffic through political agencies is prohibited.

24. Betting or wagering on elections: Betting or wagering upon the results of primary and general elections is penalized by the laws of most States and is improper political activity.

25. Activity in civic organizations and citizens' associations: Activity in organizations having for their primary object the promotion of good government or the local civic welfare is not prohibited by the act of August 2, 1939, or civil-service rule I, provided such activities have no connection with the campaigns of particular candidates or parties.

26. Parades: An employee may not march in a political parade, organize, or be an officer or leader of such a parade.

A Government employee may not take part in the activities of a musical organization in any parade or other activity of a political party.

27. Signing petitions: The first amendment to the Constitution of the United States provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." Section 6 of the act of August 24, 1912 (37 Stat. 555), provides that "the right of persons employed in the civil service of the United States, either individually or collectively, to petition Congress, or any Member thereof, or to furnish information to either House of Congress, or to any committee or Member thereof, shall not be denied or interfered with."

The right guaranteed by the Constitution and the statute extends only to petitions addressed to the Government, or to Congress or Members thereof. It does not extend to petitions addressed to State, county, or

municipal governments, or to other political units. A classified employee is permitted to sign petitions of the latter class as an individual, without reference to his connection with the Government, but he may not initiate them, circulate them, or canvass for the signatures of others.

28. Applying for Presidential positions not in the classified service: [1] When a classified employee seeks promotion by appointment or transfer to a Presidential office not in the classified service there is no objection to his becoming a candidate for such an office, provided the consent of his department is obtained, and provided he does not violate section 1 of rule I, prohibiting the use of his official authority or influence in political matters, and provided further that he does not neglect his duty and avoids any action that would cause public scandal or semblance of coercion of his fellow employees or of those over whom he desires to be placed in the position he seeks.

A classified employee may circulate a petition or seek endorsements for his own appointment to a Presidential position, subject to the qualifications above stated, and he may, as an individual, sign a petition or recommend another person for such an appointment; but he may not circulate a petition or solicit endorsements, recommendations, or support for the appointment of another person to such a position, whether such other person is a fellow employee or one not at the time in the Government service.

When an unofficial primary or election is held for the purpose of determining the popular choice for the Presidential office, a classified employee may permit his

---

[1] Appointment is made by the President by and with the advice and consent of the Senate to postmaster positions of the first, second and third classes, but these positions are in the competitive classified service under the act of June 25, 1938.

name to appear upon the ticket, but he may not solicit votes in his behalf at such a primary or election, or in any manner violate section 1 of rule I. He may vote and express privately his opinions, but may not solicit votes or publicly advocate the candidacy or election of himself or any other person. Although it is permissible for a classified employee, as an individual, to sign a petition or recommend another person for appointment to a nonclassified position, he is not permitted to sign such a petition as a Government employee or in any other way to use his official authority or influence to advance the candidacy of any person for election or appointment to any office. Classified employees are permitted to exercise the right as individuals to sign a petition favoring a candidate for any office, but they may not do so as Government employees or as a group or association of Government employees.

29. Other forms of political activity: Among other forms of political activity which are prohibited are the distribution of campaign literature, badges, or buttons, and assuming general political leadership or becoming prominently identified with any political movement, party, or faction, or with the success or failure of any candidate for election to public office.

## IV. CANDIDACY FOR OR HOLDING LOCAL OFFICE—CLASSIFIED AND NON-CLASSIFIED EMPLOYEES

30. Candidacy for local office: Candidacy for a nomination or for election to any National, State, county, or municipal office is not permissible. The prohibition against political activity extends not merely to formal announcement of candidacy but also to the preliminaries leading to such announcement and to canvassing or soliciting support or doing or permitting to be done any act in furtherance of candidacy. The fact that candidacy,

is merely passive is immaterial; if an employee acquiesces in the efforts of friends in furtherance of such candidacy such acquiescence constitutes an infraction of the prohibitions against political activity.

31. Federal employees holding local office: [2] Persons holding Federal civil office by appointment, whether in the competitive classified service or not, are prohibited from accepting or holding any office under a State, Territorial, or municipal government by an Executive order of January 17, 1873, which is as follows:

"Whereas it has been brought to the notice of the President of the United States that many persons holding civil office by appointment from him or otherwise under the Constitution and laws of the United States while holding such Federal positions accept offices under the authority of the States and Territories in which they reside, or of municipal corporations, under the charters and ordinances of such corporations, thereby assuming the duties of the State, Territorial, or municipal office at the same time that they are charged with the duties of the civil office held under Federal authority:

"And whereas it is believed that, with but few exceptions, the holding of two such offices by the same person is incompatible with a due and faithful discharge of the duties of either office; that it frequently gives rise to great inconvenience, and often results in detriment to the public service; and, moreover, is not in harmony with the genius of the Government:

"In view of the premises, therefore, the President has deemed it proper thus and hereby to give public notice that, from and after the 4th day of March A. D. 1873 (except as herein specified), persons holding any Federal civil office by appointment under the Constitution and laws of the United States will be expected, while holding

---

[2] See sec. 35.

such office, not to accept or hold any office under any State or Territorial government, or under the charter or ordinances of any municipal corporation; and, further, that the acceptance or continued holding of any such State, Territorial, or municipal office, whether elective or by appointment, by any person holding civil office as aforesaid under the Government of the United States, other than judicial offices under the Constitution of the United States, will be deemed a vacation of the Federal office held by such person, and will be taken to be and will be treated as a resignation by such Federal officer of his commission or appointment in the service of the United States.

"The offices of justices of the peace, of notaries public, and of commissioners to take the acknowledgment of deeds, of bail, or to administer oaths, shall not be deemed within the purview of this order and are excepted from its operation, and may be held by Federal officers.

"The appointment of deputy marshals of the United States may be conferred upon sheriffs or deputy sheriffs. Any deputy postmasters, the emoluments of whose office do not exceed $600 per annum, are also excepted from the operation of this order and may accept and hold appointments under State, Territorial, or municipal authority, provided the same be found not to interfere with the discharge of their duties as postmasters.[3] Heads of departments and other officers of the Government who have the appointment of subordinate officers are required to take notice of this order, and to see to the enforcement of its provisions and terms within the sphere of their respective departments or offices and as relates to the several persons holding appointments under them, respectively." [4]

---

[3] See sec. 8.

[4] A Federal employee who resigns at the expiration of his accrued

32. Interpretation of the order of January 17, 1873: An Executive order of January 28, 1873, as amended by Executive order of August 27, 1933, is as follows:

"Inquiries having been made from various quarters as to the application of the Executive order issued on the 17th of January relating to the holding of State or municipal offices by persons holding civil offices under the Federal Government, the President directs the following reply to be made:

"It has been asked whether the order prohibits a Federal officer from holding also the office of an alderman or of a common councilman in a city, or of a town councilman of a town or village, or of appointments under city, town, or village governments. By some it has been suggested that there may be distinction made in case the office be with or without salary or compensation. The city or town offices of the description referred to, by whatever names they may be locally known, whether held by election or by appointment, and whether with or without salary or compensation, are of the class which the Executive order intends not to be held by persons holding Federal offices.

"It has been asked whether the order prohibits Federal officers from holding positions on boards of education, school committees, public libraries, religious or eleemosynary institutions incorporated or established or sustained by State or municipal authority. Positions and service on such boards and committees, and professorships in colleges [5] are not regarded as 'offices' within the contemplation of the Executive order, but as employments

---

leave may accept a State or municipal position after his last day of active Federal service (16 Comp. Gen. 776, Feb. 19, 1937).

[5] Includes assistant professorships in a State college, assistant lectureships in an evening school of a municipal university, instructorships in a State college, and similar positions in State and municipal colleges and universities. (Minutes of Commission, August 7, 1937.)

or service in which all good citizens may be engaged without incompatibility and in many cases without necessary interference with any position which they may hold under the Federal Government. Officers of the Federal Government may therefore engage in such service, provided the attention required by such employment does not interfere with the regular and efficient discharge of the duties of their office under the Federal Government. The head of the department under whom the Federal office is held will in all cases be the sole judge whether or not the employment does thus interfere.

"The question has also been asked with regard to officers of the State militia. Congress having exercised the power conferred by the Constitution to provide for organizing the militia, which is liable to be called forth to be employed in the service of the United States, and is thus, in some sense, under the control of the General Government, and is, moreover, of the greatest value to the public, the Executive order of the 17th January is not considered as prohibiting Federal officers from being officers in the militia in the States and Territories.

"It has been asked whether the order prohibits persons holding office under the Federal Government being members of local or municipal fire departments, also whether it applies to mechanics employed by the day in the armories, arsenals, and navy yards, etc., of the United States. Unpaid service in local or municipal fire departments is not regarded as an office within the intent of the Executive order, and may be performed by Federal officers, provided it does not interfere with the regular and efficient discharge of the duties of the Federal office, of which the head of the department under which the office is held will in each case be the judge.

"Mechanics and laborers employed by the day in armories, arsenals, navy yards, etc., and master workmen and others who hold appointments from the Government

or from any department, whether for a fixed time or at the pleasure of the appointing power, are embraced within the operation of the order."

33. Eligibles holding local office: Eligibles who are holding a local office not excepted from the prohibitions of the order of January 17, 1873, on selection for and acceptance of any position in the competitive classified service or of unclassified laborer must immediately resign the local office. Such resignation must be effected whether the service in the local office is compensated or uncompensated or whether the employee is on active duty or leave without pay. The holding of a local office not excepted from the prohibitions of the order of January 17, 1873, is an absolute disqualification for appointment, and unless persons otherwise eligible for appointment are willing immediately to resign the local office in the event of selection for appointment, their appointments cannot be approved.

34. Minor local offices which may be held by Government officers and employees: Although the Executive orders of January 17 and January 28, 1873, prohibit generally any person holding Federal civil office by appointment, from accepting or holding an office under a State, Territorial, or municipal government, certain offices of a minor character are excepted from this general prohibition. Among these are positions of justice of the peace; notary public; commissioner to take acknowledgement of deeds, of bail, or to administer oaths; positions on boards of education, school committees, public libraries, and in religious or eleemosynary institutions. In addition, Federal employees are, under certain conditions, permitted to hold other local offices under authority of the Executive orders set forth in section 35. The permission to hold local offices granted by these Executive orders, however, is now subject to the general prohibition of section 9 of the act of August 2, 1939 (see sec. 1),

against participation in political management and in political campaigns by Federal employees.

In view of the broad language of section 9 of the act of August 2, 1939, the incumbency by a Federal employee of any elective office whatever under a State, Territorial, or municipal government is prohibited, regardless of whether or not the office is of such character that its incumbency was permitted by Executive order prior to the enactment of the act. The incumbency by a Federal employee of an appointive office under a State, Territorial, or municipal government is permissible, provided such incumbency is specifically authorized by some statute or Executive order. In securing such offices, however, and in the discharge of the duties thereof, Federal employees must not engage in political management.

MR. JUSTICE DOUGLAS, with whom MR. JUSTICE BRENNAN and MR. JUSTICE MARSHALL concur, dissenting.

The Hatch Act by § 9 (a) prohibits federal employees from taking "an active part in political management or in political campaigns." Some of the employees, whose union is speaking for them, want

> "to run in state and local elections for the school board, for city council, for mayor";

> "to write letters on political subjects to newspapers";

> "to be a delegate in a political convention";

> "to run for an office and hold office in a political party or political club";

> "to campaign for candidates for political office";

> "to work at polling places in behalf of a political party."

There is no definition of what "an active part . . . in political campaigns" means. The Act incorporates over 3,000 rulings of the Civil Service Commission between

1886 and 1940 and many hundreds of rulings since 1940. But even with that gloss on the Act, the critical phrases lack precision. In 1971 the Commission published a three-volume work entitled Political Activities Reporter which contains over 800 of its decisions since the enactment of the Hatch Act. One can learn from studying those volumes that it is not "political activity" to march in a band during a political parade or to wear political badges or to "participate fully in public affairs, except as prohibited by law, in a manner which does not materially compromise his efficiency or integrity as an employee or the neutrality, efficiency, or integrity of his agency." 5 CFR § 733.111 (a)(13).

That is to say, some things, like marching in a band, are clear. Others are pregnant with ambiguity as "participate fully in public affairs, except as prohibited by law, in a manner which does not materially compromise," etc. Permission to "[t]ake an active part . . . in a nonpartisan election," 5 CFR § 733.111 (a)(10), also raises large questions of uncertainty because one may be partisan for a person, an issue, a candidate without feeling an identification with one political party or the other.

The District Court felt that the prohibitions in the Act are "worded in generalities that lack precision," 346 F. Supp. 578, 582, with the result that it is hazardous for an employee "if he ventures to speak on a political matter since he will not know when his words or acts relating to political subjects will offend." Id., at 582–583.

The chilling effect of these vague and generalized prohibitions is so obvious as not to need elaboration. That effect would not be material to the issue of constitutionality if only the normal contours of the police power were involved. On the run of social and economic matters the "rational basis" standard which United Public

*Workers* v. *Mitchell,* 330 U. S. 75, applied would suffice.[1] But what may have been unclear to some in *Mitchell* should by now be abundantly clear to all. We deal here with a First Amendment right to speak, to propose, to publish, to petition Government, to assemble. Time and place are obvious limitations. Thus no one could object if employees were barred from using office time to engage in outside activities whether political or otherwise. But it is of no concern of Government what an employee does in his spare time, whether religion, recreation, social work, or politics is his hobby—unless what he does impairs efficiency or other facets of the merits of his job. Some things, some activities do affect or may be thought to affect the employee's job performance. But his political creed, like his religion, is irrelevant. In the areas of speech, like religion, it is of no concern what the employee says in private to his wife or to the public in Constitution Hall. If Government employment were only a "privilege," then all sorts of conditions might be attached. But it is now settled that Government employment may not be denied or penalized "on a basis that infringes [the employee's] constitutionally protected interests—especially, his interest in freedom of speech." See *Perry* v. *Sindermann,* 408 U. S. 593, 597. If Government, as the majority stated in *Mitchell,* may not condition public employment on the basis that the employee will not "take any active part in missionary work," 330 U. S., at 100, it is difficult to see why it may condition employment on the basis that the employee not take "an active part . . . in political campaigns."

---

[1] "For regulation of employees it is not necessary that the act regulated be anything more than an act reasonably deemed by Congress to interfere wth the efficiency of the public service." *United Public Workers* v. *Mitchell,* 330 U. S. 75, 101.

For speech, assembly, and petition are as deeply embedded in the First Amendment as proselytizing a religious cause.

Free discussion of governmental affairs is basic in our constitutional system. *Sweezy* v. *New Hampshire,* 354 U. S. 234, 250; *Mills* v. *Alabama,* 384 U. S. 214, 218; *Monitor Patriot Co.* v. *Roy,* 401 U. S. 265, 272. Laws that trench on that area must be narrowly and precisely drawn to deal with precise ends. Overbreadth in the area of the First Amendment has a peculiar evil, the evil of creating chilling effects which deter the exercise of those freedoms. *Dombrowski* v. *Pfister,* 380 U. S. 479, 486. As we stated in *NAACP* v. *Button,* 371 U. S. 415, 433, in speaking of First Amendment freedoms and the unconstitutionality of overbroad statutes: "These freedoms are delicate and vulnerable, as well as supremely precious in our society. The threat of sanctions may deter their exercise almost as potently as the actual application of sanctions."

*Mitchell* is of a different vintage from the present case. Since its date, a host of decisions have illustrated the need for narrowly drawn statutes that touch First Amendment rights. A teacher was held to be unconstitutionally discharged for sending a letter to a newspaper that criticized the school authorities. *Pickering* v. *Board of Education,* 391 U. S. 563, 573. "In these circumstances we conclude that the interest of the school administration in limiting teachers' opportunities to contribute to public debate is not significantly greater than its interest in limiting a similar contribution by any member of the general public." We followed the same course in *Wood* v. *Georgia,* 370 U. S. 375, when we relieved a sheriff from a contempt conviction for making a public statement in connection with a current political controversy. As in the present case, the sheriff spoke as a

private citizen and what he said did not interfere with his duties as sheriff. *Id.*, at 393–394.

The present Act cannot be appropriately narrowed to meet the need for narrowly drawn language not embracing First Amendment speech or writing without substantial revision. That rewriting cannot be done by the Commission because Congress refused to delegate to it authority to regulate First Amendment rights. The proposal to do so aroused a great debate in Congress [2] and Senator Hatch finally submitted a substitute, saying "[i]t does away with the question of the delegation of power." [3]

The Commission, on a case-by-case approach, has listed 13 categories of prohibited activities, 5 CFR § 733.122 (b), starting with the catch-all "include but are not limited to." So the Commission ends up with open-end discretion to penalize X or not to penalize him. For example, a "permissible" activity is the employee's right to "[e]xpress his opinion as an individual privately and publicly on political subjects and candidates." 5 CFR § 733.111 (a)(2). Yet "soliciting votes" is prohibited. 5 CFR § 733.122 (b)(7). Is an employee safe from punishment if he expresses his opinion that candidate X is the best

---

[2] S. 3046, as reported by the Senate Committee on Privileges and Elections, authorized "the Civil Service Commission to define the term 'active part in political management or in political campaigns' as that term is used in the prohibitions applicable to Federal employees and in the prohibitions applicable to State and local officers and employees." S. Rep. No. 1236, 76th Cong., 3d Sess., 2. The Senate was reluctant to leave the task of defining these terms "to some bureaucratic board which has absolutely no knowledge of political conditions and circumstances in any section of the country." 86 Cong. Rec. 2427 (remarks of Sen. Lucas). The section also was challenged as an unconstitutional delegation of legislative authority. *Id.*, at 2579 (remarks of Sen. Brown and Sen. McKellar). Others were concerned with problems of fairness. *Id.*, at 2720 (Sen. Bankhead).

[3] *Id.*, at 2928.

and candidate Y the worst? Is that crossing the forbidden line of soliciting votes?

A nursing assistant at a veterans' hospital put an ad in a newspaper reading:

> "To All My Many Friends of Poplar Bluff and Butler County I want to take this opportunity to ask your vote and support in the election, TUESDAY, AUGUST 7th. A very special person is seeking the Democratic nomination for Sheriff. I do not have to tell you of his qualifications, his past records stand.
>
> "This person is my dad, Lester (Less) Massingham.
>     "THANK YOU
>     "WALLACE (WALLY) MASSINGHAM"

He was held to have violated the Act. *Massingham,* 1 Political Activity Reporter 792, 793 (1959).

Is a letter a permissible "expression" of views or a prohibited "solicitation?" The Solicitor General says it is a "permissible" expression; but the Commission ruled otherwise. For an employee who does not have the Solicitor General as counsel great consequences flow from an innocent decision. He may lose his job. Therefore the most prudent thing is to do nothing. Thus is self-imposed censorship imposed on many nervous people who live on narrow economic margins.

I would strike this provision of the law down as unconstitutional so that a new start may be made on this old problem that confuses and restricts nearly five million federal, state, and local public employees today that live under the present Act.