2007 UT 30

**UTAH DEPARTMENT OF HUMAN SERVICES, Petitioner,**

v.

**Brent N. HUGHES and Career Service Review Board, Respondents.**

No. 20050610.

Supreme Court of Utah.

March 27, 2007.

Mark L. Shurtleff, Att'y Gen., Debra J. Moore, J. Clifford Petersen, Asst. Att'ys Gen., Salt Lake City, for petitioner.

Phillip W. Dyer, Carey A. Seager, Salt Lake City, for respondent Hughes.

Robert W. Thompson, Salt Lake City, for respondent Review Board.

On Certification from the Utah Court of Appeals

DURRANT, Justice:

## INTRODUCTION

¶ 1 This case concerns the Hatch Act (or the "Act"), a federal statute that prohibits state employees whose principal activity is directly related to a federally financed program from running for elective office.[1] Respondent Brent Hughes was terminated by the Utah Department of Human Services (the "Department") from his position as a collections/compliance supervisor based on the Department's determination that he had violated the Hatch Act by running for a seat in the Utah House of Representatives.

---

1. 5 U.S.C. §§ 1501–1508 (2002).

¶ 2 On appeal, the Utah Career Service Review Board (the "State Board") rescinded the Department's letter terminating Hughes. The State Board held that the federal Hatch Act preempts state law, including agency rules and policies, and that only the federal Merit Systems Protection Board (the "Federal Board") can make final determinations regarding alleged Hatch Act violations. Thus, the State Board concluded that the Department exceeded its authority in determining that Hughes violated the Hatch Act. Additionally, the State Board noted that Hughes had been treated differently from other employees, in potential violation of his due process rights.

¶ 3 We hold that, in enacting the Hatch Act, Congress did not intend to preempt state law. Indeed, the Hatch Act's very purpose is to provide an incentive for states to comply with its provisions and help achieve its overarching goals. Accordingly, state agencies may voluntarily comply with the Hatch Act and make independent determinations regarding perceived violations of the Act with respect to their employees. We therefore reverse the State Board's decision and remand so that the State Board may determine the sufficiency of Hughes's due process claim.

## BACKGROUND

¶ 4 On March 17, 2004, a few months before his termination, Brent Hughes filed his candidacy to run for a seat in District 20 of the Utah House of Representatives. On June 18, 2004, Hughes was terminated from his employment as a collections/compliance supervisor in the Office of Recovery Services in the Utah Department of Human Services due to his failure to respond to the Department's request that he comply with the federal Hatch Act and the Department's conflict of interest policy.

¶ 5 The Department's conflict of interest policy provided as follows: "During work time or during off time, when an employee's principal activity is directly related to a fed-

erally-financed program ... employees may not ... be a candidate for political office." This policy explicitly referred to the Hatch Act, which prohibits state employees whose principal activity is directly related to a federally financed program from running for elective office. Additionally, in 2004, agency rules gave the executive director authority to investigate the validity of any alleged Hatch Act violations [2] and terminate an employee for "adequate cause" [3] in accordance with certain statutory procedures.[4] Also, as part of every federal grant received by the Department, the Executive Director signed an agreement certifying that the Department would comply with the Hatch Act.

¶ 6 Hughes had been employed by the State since October 1979. On or about March 17, 2004, the Department learned that Hughes was a candidate for political office. Hughes's position with the Department's Office of Recovery Services was financed in whole or in part by federal funds, like most positions within the office.

¶ 7 On May 7, the Department advised Hughes that his candidacy violated the Hatch Act and gave him one week to comply with the Hatch Act by resigning his employment or withdrawing his candidacy. On May 13, the Department offered Hughes a third option of taking an unpaid leave of absence, pending the result of the election. The next day, Hughes asked for clarification of what would happen if he did not select one of the three options. The Department informed Hughes that his employment would be terminated if he failed to select one of the three options and gave Hughes until May 21 to make his decision.

¶ 8 Hughes did not exercise any of the above options, and on June 1, 2004, the Department issued him a notice of intent to dismiss. The notice stated that the reason for dismissal was "malfeasance," consisting of violating the Department's conflict of interest policy and failing to advance the good of the

---

**2.** Utah Admin. Code r. 477–9–4(6) (2004) (amended 2006).

**3.** *Id.* r. 477–11–2(2)(d) (2007).

**4.** *See* Utah Code Ann. § 67–19–18 (2006).

public service by deliberately violating the Hatch Act.[5]

¶ 9 Hughes requested and received a pre-termination hearing before Executive Director Arnold–Williams. On June 18, 2004, Arnold–Williams officially terminated Hughes's employment.

¶ 10 Hughes appealed his termination to the Career Service Review Board. An evidentiary hearing was then held before a State Board hearing officer. At the conclusion of the Department's case-in-chief, Hughes moved for a directed verdict, based in part on his due process claim that the Department had applied the Hatch Act inconsistently, treating him differently from other employees. The hearing officer denied the motion, concluding that, among other things, any inconsistent treatment was because Hughes's circumstances were different than those of previous employees.

¶ 11 In his November 2, 2004 Findings of Fact, Conclusions of Law, Decision and Order, the hearing officer reversed the Department's decision to terminate Hughes's employment, holding that the Department was not authorized to enforce the Hatch Act and therefore had not met its burden of showing a Hatch Act violation. He concluded that "[o]nly the United States Merit Systems Protection Board can make a determination that a party ... 'absolutely, definitely, specifically, etc.' violated the Hatch Act," and that the executive director's saying a party violated the Hatch Act "does *not* make it so." The hearing officer also found that Hughes's violation of the Department's conflict of interest policy was premised on a violation of the Hatch Act. This finding was based upon testimony from Arnold–Williams, who specifically testified during cross-examination that if there had been no alleged violation of the Hatch Act, there would have been no other basis for discipline. Additionally, the hearing officer again rejected Hughes's due process claim that the Department treated him differently from other employees, concluding that Hughes's claim was not sustainable.

¶ 12 Because the hearing officer found that the Federal Board had exclusive jurisdiction to determine whether a Hatch Act violation had taken place, he held that the State had "*not* met its burden to show that the [Department] complied with all relevant statutory and administrative requirements as to showing 'adequate cause' when terminating [Hughes's] employment." He therefore rescinded the Department's Final Decision–Dismissal letter of June 18, 2004.

¶ 13 The Department appealed the hearing officer's decision to the State Board. The Department argued that the Federal Board does not have exclusive authority to determine violations of the Hatch Act and that the hearing officer erred in requiring that the Federal Board determine that the Hatch Act had been violated before the Department could terminate an employee for violating the Department's conflict of interest policy. The State Board heard oral argument and then issued its Decision and Final Agency Action on June 17, 2005, affirming the decision of its hearing officer. The State Board noted, however, its "deep concern" that Hughes had been treated differently from other employees who had allegedly violated the Hatch Act.

¶ 14 The Department appealed the State Board's final agency decision to the Utah Court of Appeals pursuant to Utah Code section 78–2a–3(2)(a). The Utah Court of Appeals certified this case to us, and we have jurisdiction pursuant to Utah Code section 78–2–2(3)(b).

## STANDARD OF REVIEW

¶ 15 The Career Service Review Board's final agency decision raises "general questions of law"; therefore, we apply a correctness standard, granting no deference to the agency's decision.[6]

## ANALYSIS

¶ 16 The federal Hatch Act directly regulates the political activity of federal employees and indirectly regulates the political ac-

---

5. *See id.* § 67–19–18(1)(a)–(b) (stating that career service employees may be dismissed "to advance the good of the public service" or "for just causes such as ... malfeasance").

6. *Associated Gen. Contractors v. Bd. of Oil, Gas & Mining*, 2001 UT 112, ¶ 18, 38 P.3d 291.

tivity of certain state and local government employees.[7] It covers state and local employees "whose principal employment is in connection with an activity which is financed in whole or in part by loans or grants made by [the federal government]."[8] The Hatch Act's primary language states that such employees "may not ... be a candidate for elective office."[9] The Hatch Act authorizes the federal government to withhold funding to state agencies where agencies or their employees fail to comply with the Act.[10]

¶ 17 It is clear that Hughes, whose principal employment was financed in whole or in part by federal funds, violated the Hatch Act when he filed his candidacy to run for elective office. Thus, the key issue in this case is whether the Department may voluntarily comply with the Hatch Act by making independent personnel decisions based on perceived violations of the Act. In other words, does the Hatch Act preempt state law, leaving jurisdiction solely to the federal Merit Systems Protection Board to make final determinations regarding alleged violations of the Act?

¶ 18 We hold that the Hatch Act does not preempt state law. Thus, the Department may voluntarily comply with the Hatch Act and make personnel decisions accordingly. Moreover, we hold that the State Board has authority to review such decisions made by the Department or any other state agency.

¶ 19 We will first discuss enforcement of the Hatch Act and how it relates to the issue of federal preemption. Second, we will discuss the congressional intent in passing the Hatch Act and how the State Board's decision is at odds with the Act's overall purposes. Finally, we will briefly discuss Hughes's due process claim, which we remand to the State Board for further consideration.

## I. ENFORCEMENT PROVISIONS OF THE FEDERAL HATCH ACT

¶ 20 The Hatch Act authorizes the federal Office of Special Counsel (the "OSC") to prosecute alleged violations of the Act.[11] Such violations occur when federal employees or, as in this case, certain state employees engage in political activity prohibited by the Act. The OSC investigates reports of alleged violations filed by federal and state agencies, or even the public,[12] and then presents its findings and any charges based on those findings to the Merit Systems Protection Board.[13] After an opportunity for a hearing before the Federal Board, in which the relevant employee and state agency are entitled to appear, the Federal Board determines whether a violation has occurred and whether the violation warrants the employee's removal from his or her employment.[14] If the Federal Board determines a violation has occurred that warrants the employee's removal, it notifies the offending employee and state agency of its final determination and orders the removal of the employee.[15] The state agency must then comply with the Federal Board's removal order or risk the loss of federal funding.[16] If the state agency does not remove the offending employee from his or her employment within thirty days after notice from the Federal Board, the Federal Board certifies an order to the appropriate federal agency requiring it to withhold from its loans or grants to the noncomplying state

7. *See* 5 U.S.C. §§ 1501–1508 (2002) (pertaining to "Political Activity of Certain State and Local Employees").

8. *Id.* § 1501(4).

9. *Id.* § 1502(a)(3).

10. *See id.* § 1506.

11. *Id.* § 1504.

12. *See id.* ("When a Federal agency ... has reason to believe that the officer or employee has violated section 1502 of this title, it shall report the matter to the Special Counsel. On receipt of the report *or on receipt of other information which seems to the Special Counsel to warrant an investigation,* the Special Counsel shall investigate." (emphasis added)).

13. *Id.*

14. *Id.* § 1505(1)-(2).

15. *Id.* § 1505(3).

16. *See id.* § 1506.

agency an amount equal to two years' pay at the rate being received by the offending employee at the time of the violation.[17]

¶ 21 The State Board erroneously concluded that this federal enforcement scheme preempted state law. We now reverse the State Board's decision because such federal preemption is at odds with the congressional intent and overall purposes of the Hatch Act. In the next section, we will discuss federal preemption, the intent and purposes of the Hatch Act, and the fundamental inconsistencies of the State Board's decision.

## II. THE HATCH ACT DOES NOT PREEMPT STATE LAW

¶ 22 The United States Supreme Court has identified two types of federal preemption—express and implied.[18]

Express preemption, often referred to as "complete preemption," exists where a federal statute states an intent to preempt state law. By contrast, the Supreme Court has recognized that a federal statute implicitly overrides state law either when the scope of a statute indicates that Congress intended federal law to occupy a field exclusively, or when state law is in actual conflict with federal law. These scenarios of implied preemption have acquired their own labels and have become known as "field preemption" and "conflict preemption," respectively.[19]

¶ 23 The State Board based its decision on an implied field preemption analysis. Thus, we discuss only briefly express preemption and implied conflict preemption and their application to the Hatch Act in this case.

We will then discuss implied field preemption as it relates to the Department's authority to independently determine violations of the Hatch Act and voluntarily comply with its provisions.

### A. There Is No Express Preemption of State Law

■ ¶ 24 Express preemption occurs "when the language of the federal statute reveals an express congressional intent to preempt state law."[20] The Hatch Act contains no explicit statement "delivered in a clear congressional voice"[21] that reflects an intent to preempt state law, including agency rules and policies regarding the political activity of state employees. Indeed, we recently noted that the United States Supreme Court has found express preemption in only two circumstances, neither of which involved the Hatch Act.[22]

### B. There Is No Implied Conflict Preemption of State Law

■ ¶ 25 State law is also preempted to the extent that it actually conflicts with federal law. "Thus, the [United States Supreme] Court has found pre-emption where it is impossible for a private party to comply with both state and federal requirements, or where state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'"[23] In this case, Utah law, including the Department's rules and policies regulating employee political activity, is not incompatible with the Hatch Act. Indeed, Utah has adopted its own "little Hatch Act," which requires state

---

**17.** *Id.* § 1506(a)(1)-(2). Additionally, the Federal Board may order the withholding of funds to the initial state agency if "the State or local officer or employee has been removed and has been appointed within 18 months after his removal to an office or employment in the same State in a State or local agency which does not receive loans or grants from a Federal agency." *Id.* § 1506(a)(2).

**18.** *English v. Gen. Elec. Co.,* 496 U.S. 72, 78–79, 110 S.Ct. 2270, 110 L.Ed.2d 65 (1990).

**19.** *Utah Div. of Consumer Prot. v. Flagship Capital,* 2005 UT 76, ¶ 11, 125 P.3d 894 (internal quotation marks and citations omitted).

**20.** *Mount Olivet Cemetery Ass'n v. Salt Lake City,* 164 F.3d 480, 486 (10th Cir.1998).

**21.** *Flagship Capital,* 2005 UT 76, ¶ 13, 125 P.3d 894.

**22.** *Id.* ¶ 12 (noting express federal preemption in "certain causes of action under the Labor Management Relations Act of 1947 and the Employee Retirement Income Security Act of 1974 (ERISA)" (citations omitted)).

**23.** *Id.* ¶ 21 (quoting *English,* 496 U.S. at 79, 110 S.Ct. 2270).

compliance with the federal version.[24] Additionally, the Department's rules and policies specifically refer to the Hatch Act, requiring employee compliance with its provisions. Furthermore, in 2004, the Department's Executive Director had authority, under Utah statutory law, to investigate the validity of any alleged Hatch Act violations[25] and to terminate an employee for "malfeasance,"[26] which may include the employee's failure to comply with the Department's policies regarding political activity prohibited by the Act. These statutes and policies are entirely consistent with the Hatch Act's primary purpose and do not conflict with its overall enforcement scheme.

### C. There Is No Implied Field Preemption of State Law

¶ 26 In discussing implied field preemption, the United States Supreme Court has explained as follows:

[I]n the absence of explicit statutory language, state law is pre-empted where it regulates conduct in a field that Congress intended the Federal Government to occupy exclusively. Such an intent may be inferred from a scheme of federal regulation ... so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it, or where an Act of Congress touches a field in which federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject.[27]

¶ 27 The State Board rested its decision on an implied field preemption analysis, holding that the Hatch Act preempts state law because it "creates a scheme of federal regulation 'so pervasive as to make reasonable the inference that Congress left no room for States to supplant it.'"[28] The State Board observed that the Hatch Act "exclusively charges federal agencies with a duty to report suspected Federal Hatch Act violations to the OSC."[29] Then, the OSC "exclusively must do an investigation and report its findings to [the Federal Board]. If [the] OSC concludes that a violation has occurred, it must file charges with the [Federal Board] ..., [which] is statutorily required to afford a state and/or its employee an evidentiary hearing."[30] Furthermore, the State Board noted that the Federal Board "has jurisdiction over complaints regarding violations of the Federal Hatch Act and has further required that the standard of proof in Federal Hatch Act cases be a preponderance of the evidence standard."[31] This evidence standard "differs significantly from the substantial evidence standard the Department is required to prove before the [State Board]."[32] The State Board finally noted that the federal courts have jurisdiction over appeals from the ultimate findings of the Federal Board.[33] Thus, the State Board concluded that, in light of these factors, the Hatch Act impliedly preempted state law through a pervasive federal scheme.[34] As a result, the State Board held that "the Department exceeded its authority in determining that Mr. Hughes violated the Federal Hatch Act."[35] We disagree.

24. *See* Utah Code Ann. § 67–19–19(3) (2006) ("Nothing contained in this section may be construed to: ... permit partisan political activity by any employee who is prevented or restricted from engaging in the political activity by the provisions of the federal Hatch Act.").

25. Utah Admin. Code r. 477–9–4(6) (2004) (amended 2006).

26. Utah Code Ann. § 67–19–18(1)(b) (2006).

27. *English,* 496 U.S. at 79, 110 S.Ct. 2270 (internal quotation marks and citations omitted).

28. Hughes, 8 CSRB 80 (2005) (final agency decision) (quoting *Barnett Bank v. Nelson,* 517 U.S. 25, 31, 116 S.Ct. 1103, 134 L.Ed.2d 237 (1996)).

29. *Id.* (citing 5 U.S.C. § 1504 (2002)).

30. *Id.* (citing 5 U.S.C. §§ 1504–1505).

31. *Id.*

32. *Id.*

33. *Id.*

34. *Id.*

35. *Id.*

¶ 28 In enacting the Hatch Act, Congress did not intend to create a pervasive federal scheme or dominate an entire field so exclusively as to preempt state law. Accordingly, state agencies may make independent determinations regarding perceived violations of the Act and voluntarily comply with its provisions in order to remain eligible for federal funding.

### 1. Congress Intended that States Voluntarily Comply with the Hatch Act

¶ 29 In *Oklahoma v. United States Civil Service Commission*,[36] the United States Supreme Court stated that "[t]he end sought by Congress through the Hatch Act is better public service by requiring those who administer funds for national needs to abstain from active political partisanship."[37] Thus, "Congress effectively designed the Hatch Act to combat demonstrated ill effects of Government employees' partisan political activities."[38] With respect to the federal government, and the States by virtue of its spending power, Congress intended to foreclose the potential for political corruption and assuage the public's fear of political bias within federal, state, and local governments.[39] Additionally, Congress intended that advancement in government service "not depend on political performance" and that employees "would be free from pressure ... to vote in a certain way or perform political chores in order to curry favor with their superiors rather than to act out their own beliefs."[40] Thus, Congress used its

spending power relative to the States in order to withhold federal money from state agencies whose employees do not comply with the Hatch Act's provisions, such as, in this case, by running for elective office while employed in a position funded in whole or in part by federal money.

¶ 30 The Hatch Act is not an exercise of any enumerated power to regulate state and local political activity—indeed, because there is no such power, such regulation would be unconstitutional.[41] The overall scheme of the Hatch Act simply provides monetary incentives for states to comply with its provisions and help achieve the Act's stated purposes. As a result, the regulatory field that the Hatch Act occupies in relation to the States relates to the enforcement of this federal funding scheme. The Federal Board is given authority to withhold federal funding when it (1) determines that the Hatch Act's provisions have been violated by a federally funded state employee, (2) concludes that removal of the employee is warranted, (3) orders the state agency to remove the employee, and (4) the state agency does not comply with the removal order. Hence, the "enforcement" of the Hatch Act, as it relates to the States, is limited to this narrow authority to withhold federal funding for noncompliance.

¶ 31 Therefore, where a state agency makes a personnel decision based on an independent determination of a perceived Hatch Act violation, it is not "enforcing" the Hatch Act. A state agency is instead enforcing its

---

**36.** 330 U.S. 127, 67 S.Ct. 544, 91 L.Ed. 794 (1947).

**37.** *Id.* at 143, 67 S.Ct. 544.

**38.** *United States v. Nat'l Treasury Employees Union*, 513 U.S. 454, 471, 115 S.Ct. 1003, 130 L.Ed.2d 964 (1995).

**39.** *See U.S. Civil Serv. Comm'n v. Nat'l Ass'n of Letter Carriers*, 413 U.S. 548, 565–66, 93 S.Ct. 2880, 37 L.Ed.2d 796 (1973) ("A major thesis of the Hatch Act is that to serve this great end of Government-the impartial execution of the laws—it is essential that federal employees, for example, not take formal positions in political parties, ... and not run for office on partisan political tickets. Forbidding activities like these will reduce the hazards to fair and effective government."); *id.* ("[I]t is not only important that

the Government and its employees in fact avoid practicing political justice, but it is also critical that they appear to the public to be avoiding it, if confidence in the system of representative Government is not to be eroded to a disastrous extent."); *id.* ("Another major concern ... was the conviction that the rapidly expanding Government work force should not be employed to build a powerful, invincible, and perhaps corrupt political machine.").

**40.** *Id.* at 566, 93 S.Ct. 2880.

**41.** *See Oklahoma*, 330 U.S. at 143, 67 S.Ct. 544 (stating that, with respect to the Hatch Act, "the United States is not concerned with, and has no power to regulate, local political activities as such of state officials, [but] it does have the power to fix the terms upon which its money allotments to states shall be disbursed").

own rules and policies, which may utilize provisions of the Hatch Act in order to achieve compliance with the Act and remain eligible for federal funding. A state agency is not treading upon federal authority reserved solely for the OSC or the Federal Board—a state agency has no authority to prosecute alleged violations of the Act or make findings under the Act that will ultimately determine on what terms a state agency may receive federal funds.

¶ 32 The Utah Court of Appeals' opinion in *Utah Department of Corrections v. Despain*[42] is helpful in illustrating the way in which two separate governmental agencies can independently determine the same legal issue for different purposes. In *Despain*, the defendant, a prison guard employee for the Utah Department of Corrections, was terminated for assaulting his wife in violation of a departmental policy that prohibited "[a]ny act or conduct that constitutes a wrongful practice as defined by federal, state or local law."[43] The Department of Corrections determined that the defendant had violated state criminal law and as a result had violated its departmental policy.[44] On appeal, the Career Service Review Board found a factual basis for the assault allegations; however, the State Board rescinded the defendant's termination, concluding that because the defendant had not been convicted or even charged with assault, he did not violate the departmental policy.[45]

¶ 33 The Utah Court of Appeals reversed the State Board's decision, holding that "a policy violation does not require a conviction," and that "the facts indicate that [the defendant] violated [a state criminal statute] even though he was released after his arrest."[46] Thus, the state agency had authority, without a preceding criminal adjudication, to independently assess federal or state law to determine whether its departmental policy had been violated and make a personnel decision accordingly. The state agency was not enforcing the criminal law, which remained the sole function of a federal or state prose-

cutor, but was rather determining that a violation of the criminal law had taken place relative to its own departmental policy.

¶ 34 In this case, the Career Service Review Board erred in holding that the Department must first obtain an advisory opinion from the OSC officially determining that Hughes had violated the Hatch Act before terminating his employment. As *Despain* illustrates, although within a criminal context, the Department in this case has authority, without a prior determination from the OSC or the Federal Board, to independently assess whether the Hatch Act was violated by an employee with respect to the Department's conflict of interest policy and to make personnel decisions accordingly. In doing so, the Department is not "enforcing" the Hatch Act and treading upon the federal roles reserved for the OSC and the Federal Board. Furthermore, the Hatch Act does not explicitly or implicitly require the Department, or any other state agency, to obtain an advisory opinion from either the OSC or the Federal Board before independently determining perceived violations of the Act with respect to federally funded employees.

2. The Career Service Review Board's Decision Is at Odds with the Congressional Intent of the Hatch Act

¶ 35 For us to hold, as did the State Board, that the Department did not have authority to assess whether the Hatch Act had been violated by one of its federally-funded employees, we necessarily would have to conclude that Congress intended to preclude state agencies from voluntarily complying with the Hatch Act. As we have discussed above, this cannot be the case.

¶ 36 Under the State Board's holding, if a state agency becomes aware that its federally funded employee is a candidate for partisan elective office, it cannot take personnel action to protect against the potential loss of federal funding. Only the Federal Board would

---

42. 824 P.2d 439 (Utah Ct.App.1991).

43. *Id.* at 444.

44. *Id.*

45. *Id.* at 444–45.

46. *Id.*

have authority to make final determinations regarding alleged violations of the Hatch Act. Thus, in this case, the agency's only recourse would be to wait and see if the Federal Board concludes that the Hatch Act was violated—and potentially face the costs of federal litigation and the possible withdrawal of federal funding. This is not what Congress had in mind when it passed the Hatch Act. And although an advisory opinion may be obtained before personnel action is taken, it is not required by the Act itself, and therefore, the potential availability of such an opinion does nothing to change our analysis.

¶ 37 Ultimately, if we were to adopt the interpretation offered by the State Board, we would have to conclude that, notwithstanding the congressional intent to encourage states to comply with the Hatch Act and assist in its overarching goals, Congress also intended to preclude states from voluntarily complying with the Hatch Act, or even guarding against potential violations. These two positions are fundamentally inconsistent. Thus, we reverse the State Board's decision and hold that the Hatch Act does not preempt state law.

## III.  HUGHES'S DUE PROCESS CLAIM

█ ¶ 38 Finally, we address the question of whether Hughes's due process rights were violated in that he was treated differently from other employees. In the initial evidentiary hearing, the State Board's hearing officer rejected Hughes's claim that he was treated differently from other employees who had violated the Hatch Act, in violation of his due process rights. In its decision, however, the State Board noted that the "evidentiary record undisputedly establishes that Mr. Hughes was treated differently from four other individuals who were either candidates for, or actually elected to, partisan political office while employees of the Department." Unlike the hearing officer's decision, the State Board discussed specifically the different ways the Department treated previous employees that were in circumstances similar to Hughes:

> Three of these individuals were never asked to resign after declaring their candidacy for partisan elective office. One of these individuals was asked to resign only after he won election to the Utah State Senate in 1996. Another individual was not asked to resign by the Department even after winning election to the Utah State House of Representatives because the Department did not believe this individual's position was funded by federal funds.

¶ 39 Although the State Board stated that the due process issue was not before it on appeal because Hughes had prevailed in the evidentiary hearing,[47] the State Board noted its "deep concern regarding the Department's inconsistent treatment of Mr. Hughes in this case."

¶ 40 In contrast to an appellate court, the Career Service Review Board has some fact-finding authority in reviewing the initial decision of its hearing officer:

> The [State Board] shall first make a determination of whether the factual findings of the [State Board] hearing officer are reasonable and rational according to the substantial evidence standard. When the [State Board] determines that the factual findings of the [State Board] hearing officer are not reasonable and rational based on the [evidentiary] record as a whole, then the [State Board] may, in its discretion, correct the factual findings, and also make new or additional factual findings.[48]

47. The Department argues that Hughes did not cross-appeal the hearing officer's finding with regard to his due process claim. As a result, the Department claims that the due process issue was not properly before the State Board and is not before us now. While it is true that Hughes did not specifically argue his due process claim on appeal to the State Board, he noted in his reply brief in that appeal that "if the [State Board] does not affirm the [hearing officer's] Decision on the grounds asserted in this Brief,

[Hughes] asserts he should be entitled to submit supplement[al] briefing on the theories posed in [his] Motion [For A Directed Verdict]," which included his due process claim. Thus, it appears that Hughes made at least some attempt to preserve the due process claim in his reply brief to the Department's appeal to the State Board.

48. Utah Admin. Code r. 137–1–22(4)(a)(2007).

¶ 41 Additionally, "[i]f issues . . . are . . . satisfactorily resolved, they may not qualify to be advanced further . . . and the [State Board] may refuse to hear or take action." [49] In this case, it is unclear whether the due process issue was "satisfactorily resolved" and whether the State Board made a new or corrected factual finding regarding Hughes's inconsistent treatment, and if so, whether this might be an alternative basis for its reinstatement order. Accordingly, we remand to the State Board to determine the sufficiency of Hughes's due process claim.

## CONCLUSION

¶ 42 We reverse the Career Service Review Board's decision and hold that, consistent with congressional intent, the federal Hatch Act does not preempt state law. As a result, state agencies may voluntarily comply with the Hatch Act and make independent determinations regarding perceived violations of the Act with respect to their employees. We remand to the State Board, however, for further consideration of the sufficiency of Hughes's due process claim.

¶ 43 Chief Justice DURHAM, Associate Chief Justice WILKINS, Justice PARRISH, and Justice NEHRING concur in Justice DURRANT's opinion.