2008 UT 69

Richard MADSEN and Nancy Madsen, for themselves and all others similarly situated, Plaintiffs, Appellants, and Cross–Appellees,

v.

WASHINGTON MUTUAL BANK FSB, (successor to Prudential Federal Savings and Loan Association), Defendant, Appellee, and Cross–Appellant.

No. 20060597.

Supreme Court of Utah.

Sept. 23, 2008.

Rehearing Denied Dec. 5, 2008.

Robert J. Debry, Lynn P. Heward, Salt Lake City, for plaintiffs.

Joseph J. Palmer, Stephen C. Tingey, Elaina M. Maragakis, Salt Lake City, for defendant.

DURRANT, Associate Chief Justice:

## INTRODUCTION

¶ 1 In 1964, Richard and Nancy Madsen financed the purchase of their home by borrowing money from Prudential Federal Savings and Loan Association ("Prudential") under a real estate mortgage contract. The contract obligated the Madsens to make monthly payments into an account held by Prudential for the purpose of paying taxes and insurance premiums. Prudential paid no interest or earnings on the running account balance. The Madsens sued, seeking interest on their account. This case requires us to decide whether the Madsens may recover, on a common law accounting theory, profits that Prudential and its successor, Washington Mutual Bank ("WAMU") may have earned from the use of the funds, or whether federal law preempts the Madsens' claim. We hold that federal law preempts the Madsens' claim.

## BACKGROUND

¶ 2 This is the third appeal before us in the protracted history of this case, which was initiated more than thirty years ago. And although we have twice ruled in this case on appeal, our analysis of the issues requires a full explanation of the facts and procedural history.

¶ 3 The facts forming the basis for the Madsens' claim are not in dispute. In 1964, the Madsens borrowed money from Prudential to finance the purchase of their home. The standard form trust deed used by Prudential required the Madsens, as trustors, to make monthly "budget payments" into an account held by Prudential, the trustee and beneficiary of the trust deed:

> In addition to the monthly payments as provided in said note the TRUSTOR agrees to pay to the beneficiary, upon the same day each month, budget payments estimated to equal one-twelfth of the annual taxes and insurance premiums; said budget payments to be adjusted from time to time as required, and said budget payments are hereby pledged to the BENEFICIARY as additional security for the full performance of this deed of trust and the note secured hereby. The budget payments so accumulated may be withdrawn by the BENEFICIARY for the payment of taxes or insurance premiums due on the premises. The BENEFICIARY may at any time, without notice, apply said budget payments to the payment of any sums due under the terms of this deed of trust and the note secured hereby or either of them.

The trust deed did not contain any provision requiring Prudential to pay interest or profits on the budget payments, and Prudential paid none.

¶ 4 In 1975, the Madsens sued Prudential as the representatives of a class of borrowers who, like the Madsens, made budget payments to Prudential under the terms of their trust deeds. The Madsens brought a claim for breach of contract and sought an accounting of interest or profits under a theory of unjust enrichment (the "accounting claim"). The Madsens argued that Prudential was unjustly enriched because the budget payments were held as a pledge and the common law required Prudential, as pledgee, to account for any profits earned through the use of the pledge.

¶ 5 After the district court certified the class, Prudential sought judgment as a matter of law. In separate motions, Prudential moved the court to dismiss or grant summary judgment in its favor. In both motions, Prudential argued that federal law, which specifically authorized Prudential to hold budget payments without paying interest, preempted the Madsens' accounting claim. Furthermore, in one of its motions,

Prudential argued that the contract, which was complete and unambiguous, contained no provision obligating Prudential to pay interest.

¶ 6 The district court granted summary judgment to Prudential on its contract claim without addressing its preemption claim. The court reasoned that "neither the contract provisions, express or implied, the principles of 'unjust enrichment,' nor those of 'pledges' give to plaintiffs a claim upon which relief can be granted on the contract in question." The Madsens appealed, and we took up the case in *Madsen v. Prudential Federal Savings & Loan Ass'n ("Madsen I")*.[1] We reversed, holding that the funds deposited under the loan agreement satisfied the essential elements of a common law pledge: "The essential elements of a pledge are contained in the agreement, viz., the existence of a debt or obligation, a transfer of property to the pledgee, to be held as security and, if necessary, to be used to assure performance of the obligation."[2] We held that the common law of pledge required that "if from the use of [the pledge] profits are derived, pledgee must, in the absence of a special agreement, account for them to the pledgor."[3] Thus we remanded the case to the district court to consider the Madsens' accounting claim.

¶ 7 Although Prudential referred to federal banking regulations as part of its policy argument in its appellate brief to us, Prudential did not argue federal preemption. Accordingly, our decision did not address federal banking regulations or federal preemption. Nor did our decision address the Madsens' claim for breach of contract. Instead, we confined our decision to whether the budget payments constituted a common law pledge.[4] We reversed the district court's grant of summary judgment, holding that the budget payments were such a pledge and that the Madsens could pursue their accounting claim.[5]

¶ 8 Following the remand, Prudential removed the case to federal district court, asserting, as a basis for federal jurisdiction, that the case involved an important question of federal law. The Madsens moved for dismissal, arguing that the federal court lacked jurisdiction. When the federal district court denied the Madsens' motion to dismiss, the Madsens appealed to the United States Court of Appeals for the Tenth Circuit in *Madsen v. Prudential Federal Savings & Loan Ass'n ("Madsen II")*.[6] The Tenth Circuit reversed, holding that "Prudential's claim of federal preemption is in the nature of a defense to the Madsens' cause of action and cannot be the basis of federal question jurisdiction on removal."[7] The case was remanded to the state district court.[8]

¶ 9 On remand in the state district court, Prudential revived the federal preemption argument in a new motion for summary judgment. In reply, the Madsens alleged that although we did not mention the federal preemption issue in our ruling, we had already decided the issue in the Madsens' favor in *Madsen I*. The Madsens further argued that the issue was decided in their favor by the Tenth Circuit in its ruling that the federal court had no jurisdiction. After a hearing, the district court ruled simply, "Prudential's Motion for Summary Judgment based upon federal preemption is hereby denied," offering no further explanation.

¶ 10 The parties proceeded to try the "test case" of Prudential's liability. Judge Kenneth Rigtrup limited the trial to the issue of whether Prudential earned profit from the use of the Madsens' pledged funds and, if so, how much. Because he narrowed the scope of the trial to this one issue, he did not allow Prudential to present evidence or argue in support of several defenses that it had urged. He did not allow Prudential to argue federal preemption or introduce evidence of a "special agreement" whereby the parties agreed

---

1. 558 P.2d 1337 (Utah 1977).

2. *Id.* at 1339.

3. *Id.* at 1340.

4. *Id.* at 1339–40.

5. *Id.*

6. 635 F.2d 797 (10th Cir.1980).

7. *Id.* at 802.

8. *Id.* at 804.

that no interest would be paid. He then ruled in favor of the Madsens, awarding them $134.70 plus interest from the date of judgment on their individual claim.[9]

¶ 11 Prior to the trial and again prior to issuing his ruling, Judge Rigtrup disclosed to the parties that he was a potential class member, having financed the purchase of his own home by borrowing from Prudential.[10] Thirty-nine days after this ruling, Prudential moved to disqualify Judge Rigtrup. The presiding judge granted Prudential's motion, and the Madsens sought permission to file an interlocutory appeal.[11]

¶ 12 We granted such permission and addressed Judge Rigtrup's disqualification in *Madsen v. Prudential Federal Savings & Loan Ass'n ("Madsen III")*.[12] We held that Prudential's motion to disqualify was not timely.[13] We also ruled that Prudential apparently acquiesced in Judge Rigtrup's rendering a decision by failing to move for his disqualification until thirty-nine days after his ruling.[14] We concluded that Prudential's acquiescence was evidence that it did not believe that Judge Rigtrup should recuse himself.[15] Further, we noted that although Judge Rigtrup had personal knowledge of some of the disputed facts and had a financial interest in the outcome of the case, the presiding judge expressly found no actual bias.[16]

¶ 13 Following the remand, Judge Rigtrup made a number of rulings, some of which the parties challenge in this appeal. First, he defined the class consistent with the Madsens' complaint as borrowers who had purchased a "single[-]family, owner-occupied, primary residence." This ruling excluded from the class borrowers who financed second homes, commercial properties, and multiplexes. Second, he ruled that the four-year statute of limitations in Utah Code section 78–12–25(3), "for relief not otherwise provided for by law," applied to the case. Third, he ruled that the 1979 Interest on Mortgage Loan Accounts Act cut off damages as of 1979. Thus, he limited the Madsens to recovering for the period from 1971 to 1979. Fourth, he ruled that the Madsens were not entitled to prejudgment interest but that interest during the eight-year period would be compounded. Fifth, he appointed a special master to locate and define the class members and ascertain damages. The special master filed a final report on March 1, 2002, concluding that there were 9,547 class members, who were owed an average of $105.18, resulting in a total judgment of $1,004,153. The trial court, now presided over by Judge L.A. Dever, entered a judgment for that amount.

¶ 14 The Madsens appeal, and WAMU cross-appeals. Each asserts multiple errors. The Madsens assert that the district court erred by

(1) applying a four-year statute of limitations rather than applying a six-year statute of limitations or holding that no limitations period applied;[17]

(2) ruling that the 1979 Interest on Mortgage Loan Accounts Act cut off damages after 1979;

(3) failing to award prejudgment interest covering the period from 1979 to the judgment;

---

9. *Madsen v. Prudential Fed. Sav. & Loan Ass'n*, 767 P.2d 538, 541 (Utah 1988).

10. *Id.* at 539–40.

11. *Id.* at 541.

12. 767 P.2d 538 (Utah 1988).

13. *Id.* at 543.

14. *Id.* at 543–44.

15. *Id.*

16. *Id.* at 544.

17. Utah Code section 78B–2–307 (Supp.2008), which the court applied, provides that "[a]n action may be brought within four years ... for relief not otherwise provided for by law." The Madsens argue that the court should have applied the former section 78–12–34 (now repealed), which provided that "actions [may be] brought, to recover money or other property deposited with any bank, trust company or savings and loan corporation, association or society, [without] limitation," or, in the alternative, section 78–12–25(2) (now amended), which provided a six-year statute of limitations for actions founded "upon any contract, obligation, or [for] liability founded upon an instrument in writing."

(4) narrowing the class to include only borrowers who financed owner-occupied single-family homes, which excluded borrowers who financed duplexes, second homes, and commercial properties; and

(5) failing to disqualify the special master because he held ex parte meetings with WAMU and relied heavily on the work of WAMU employees.

¶ 15 The Madsens further argue that we should simplify the accounting of the profits earned and end the case by ordering the district court to use the pass-book savings rate instead of continuing the case with a newly appointed special master.

■ ¶ 16 WAMU cross-appeals, asserting that the district court

(1) erred as a matter of law by not granting summary judgment on the basis that federal law as codified in 12 C.F.R. § 545.6–11(c) preempts the Madsens' state law claims; [18]

(2) erred by excluding evidence of a "special agreement" between the parties that no interest be paid on the pledged funds;

(3) erred in certifying the class under rule 23(b)(1)(A) of the Utah Rules of Civil Procedure; and

(4) erred in awarding compound interest during the 1971 to 1979 accounting period.

¶ 17 We have jurisdiction pursuant to Utah Code section 78A–3–102(3)(j) (Supp.2008).

## ANALYSIS

¶ 18 In this opinion, we will first discuss the law of preemption generally. Then, we will discuss WAMU's argument that federal law preempts the Madsens' claim. We will also address the Madsens' contention that both this court and the Tenth Circuit have already decided the preemption question in the Madsens' favor in *Madsen I* and *Madsen II*, respectively. Because we hold that federal regulations preempt the Madsens' claim, it is unnecessary to reach the other issues on appeal and cross-appeal.

## I. FEDERAL LAW PREEMPTS CONFLICTING STATE LAW

■ ¶ 19 Whether federal law preempts a state law cause of action is a question of law.[19] We review questions of law for correctness, giving no deference to the ruling of the court below.[20] Under the Supremacy Clause of the United States Constitution,[21] federal law preempts state law "where it regulates conduct in a field that Congress intended the Federal Government to occupy exclusively" or "to the extent that it actually conflicts with federal law." [22] In either case, it does not matter whether the state law is statutory or common law or whether the federal law is a federal regulation or statute of Congress.[23]

¶ 20 In this case, WAMU has argued that the Madsens' state law accounting claim, which requires WAMU to pay profits earned on the Madsens' pledged funds, conflicts with

18. WAMU preserved its federal preemption argument by making the argument to the district court both before and after *Madsen I* and to the federal district court. However, WAMU's brief in this appeal did not include a citation to the record showing that it had preserved this issue as required by our rule 24(a)(5) of the Utah Rules of Appellate Procedure. While we decline to sanction WAMU under rule 24(k), we warn future litigants that compliance with our briefing requirements is not discretionary, and litigants who fail to comply take the risk that we may disregard or strike briefs or arguments. *See, e.g., Peters v. Pine Meadow Ranch Home Ass'n*, 2007 UT 2, ¶ 23, 151 P.3d 962. We decline to disregard WAMU's preemption argument because, despite WAMU's oversight in this regard, it is clear that WAMU preserved the federal preemption

argument and otherwise fully complied with the briefing requirements found in rule 24.

19. *See Dep't of Human Servs. v. Hughes*, 2007 UT 30, ¶ 15, 156 P.3d 820; *see also Retherford v. AT & T Commc'ns*, 844 P.2d 949, 958–59 (Utah 1992).

20. *R.A. McKell Excavating, Inc. v. Wells Fargo Bank, N.A.*, 2004 UT 48, ¶ 7, 100 P.3d 1159.

21. U.S. Const. art. VI, cl. 2.

22. *English v. General Elec. Co.*, 496 U.S. 72, 79, 110 S.Ct. 2270, 110 L.Ed.2d 65 (1990).

23. *See Free v. Bland*, 369 U.S. 663, 667–68, 82 S.Ct. 1089, 8 L.Ed.2d 180 (1962).

federal law as codified in 12 C.F.R. § 545.6–11(c). WAMU contends that under this regulation and other federal laws, it has no obligation to pay interest or earnings on such accounts. If, under federal law, WAMU has no obligation to pay interest or earnings on the Madsens' pledged funds, federal law conflicts with, and therefore preempts, the Madsens' state law accounting claim.

## II. UNDER FEDERAL REGULATIONS IN EFFECT AT THE TIME OF THE CONTRACT, PRUDENTIAL HAD NO OBLIGATION TO PAY INTEREST ON RESERVE ACCOUNTS

¶ 21 WAMU argues that 12 C.F.R. § 545.6–11(c), which exempts federal savings and loan associations from paying interest under certain circumstances, preempts any state law under which the Madsens might recover. That section reads as follows:

> A Federal association which makes a loan on or after June 16, 1975, on the security of a single-family dwelling occupied or to be occupied by the borrower (except such a loan for which a bona fide commitment was made before that date) shall pay interest on any escrow account maintained in connection with such a loan (1) if there is in effect a specific statutory provision or provisions of the State in which such dwelling is located by or under which the State-chartered savings and loan associations, mutual savings banks and similar institutions are generally required to pay interest on such escrow accounts, and (2) at not less than the rate required to be paid by such State-chartered institutions but not to exceed the rate being paid by the Federal association on its regular accounts (as defined by Section 526.1 of this chapter). Except as provided by contract, a Federal association shall have no obligation to pay interest on escrow accounts apart from the duties imposed by this paragraph.[24]

¶ 22 Under this regulation, Prudential had no obligation to pay interest to the Madsens absent a state statute or contractual obligation to the contrary. The Madsens' accounting claim is not founded on a contract or statute. By its express terms, however, the regulation applies only prospectively to loans made after June 16, 1975. It does not apply to the Madsens' loan, which Prudential made in 1964. But WAMU argues that § 545.6–11(c) did not alter the federal law applicable to the loans made before 1975. Rather, WAMU contends, the 1975 change merely reaffirmed the impact of two existing regulations, which also provide that Prudential had no obligation to pay interest to the Madsens.[25]

 ¶ 23 WAMU is correct. Two regulations predating the Madsens' loan, 12 C.F.R. §§ 544.1 and 541.5, directly conflict with the Madsens' state law cause of action. Both regulations became part of the federal register in 1958 and thus apply to the Madsens' 1964 loans.[26] Section 544.1 provides that a federal home loan association such as Prudential "is not required to distribute earnings on short-term savings accounts."[27] Section 541.5 defines short-term savings accounts to include "a savings account in a Federal association established for the purpose of accumulating funds to pay taxes or insurance premiums, or both, in connection with a loan on the security of a lien on real estate."[28] The Madsens' account held by Prudential fits this definition precisely. Therefore, the account is subject to section 544.1, which explicitly provides that lenders who hold such accounts have no obligation to pay interest or earnings absent an agreement or state statute. The regulations directly conflict with the Madsens' state law claim. Federal law, therefore, preempts the Madsens' state law claim for interest on their account.

## III. NEITHER THIS COURT NOR THE TENTH CIRCUIT HAS YET RULED ON THE MERITS OF THE FEDERAL PREEMPTION ISSUE

¶ 24 The Madsens do not make any attempt to counter WAMU's federal preemp-

---

24. 12 C.F.R. § 545.6–11(c) (1976).

25. The Home Owners' Loan Act of 1933 created the Federal Home Loan Bank Board, which promulgated regulations governing the savings and loan industry beginning in 1933.

26. 23 C.F.R. § 9893 (1958).

27. 12 C.F.R. § 544.1 (1975).

28. 12 C.F.R. § 541.5 (1975).

tion argument on the merits. Instead, their argument on appeal consists entirely of an assertion that the federal preemption issue has already been decided by this court in *Madsen I* and by the Tenth Circuit in *Madsen II*. But our opinion in *Madsen I* did not address, much less decide, the issue of federal preemption. And in *Madsen II*, the Tenth Circuit dismissed the case purely for lack of federal jurisdiction. As we did not rule on the merits of WAMU's federal preemption argument in *Madsen I*, and as the Tenth Circuit dismissed the case for lack of jurisdiction without reaching the merits in *Madsen II*, we now address for the first time the merits of WAMU's federal preemption argument.

### A. We Did Not Rule on the Merits of Federal Preemption in Madsen I

■ ¶ 25 The issue of preemption was not before us in *Madsen I*.[29] The district court had ruled that neither the contract nor the principles of pledge gave rise to a claim upon which relief could be granted. The district court did not rule on the issue of preemption. Accordingly, neither party appealed the issue of federal preemption. Our decision in *Madsen I* focused exclusively on whether the Madsens' budget payments satisfied the elements of a common law pledge.[30] We reversed the district court's ruling, holding that the budget payments met the elements of a common law pledge because there was "a debt or obligation, a transfer of property to the pledgee, to be held as security and, if necessary, to be used to assure performance of the obligation."[31] The decision did not include a single reference to any federal law, much less a resolution of whether federal law preempts the Madsens' accounting claim.

■ ¶ 26 The Madsens' argue that, although they did not appeal the issue of preemption and neither our opinion nor the district court's grant of summary judgment

addressed preemption, "Prudential's federal theory has already been presented to the Utah Supreme Court" and that "[i]f 12 C.F.R. § 545.6–11(c) destroyed Madsen's [sic] cause of action, the Utah Supreme Court would have been forced to affirm the trial court's dismissal over thirty years ago." This assertion is contrary to our well-established precedent that "an appellate court *may* affirm the judgment appealed from 'if it is sustainable on any legal ground or theory apparent on the record.' "[32] When reviewing a decision made on one ground, we have the *discretion* to affirm the judgment on an alternative ground if it is apparent in the record. But that cannot mean, as the Madsens' contend here, that our declining to rule on an alternative ground can be construed as a ruling on the merits of the alternative ground, particularly when the alternative ground has not been argued by either party to the appeal. In fact, we frequently decline to rule on an issue when it has not been fully briefed by the parties because full briefing allows this court to carefully consider fully developed and supported arguments.[33] The decision not to reach an alternative ground is certainly not binding on the court below, particularly when the parties did not argue the issue and this court's decision does not include so much as a single reference to the issue now supposedly foreclosed.

¶ 27 In support of their argument that we have already ruled on the issue of preemption, the Madsens assert that Prudential made the federal preemption argument in its briefs. In fact, Prudential's appellate brief in *Madsen I* cited federal banking regulations, including 12 C.F.R. § 545.6–11(c) in support of its policy argument against applying the law of pledge. But Prudential did not mention the law of federal preemption. The Madsens' briefs in that appeal likewise did not argue preemption. Thus the Mad-

---

29. 558 P.2d 1337 (Utah 1977).

30. *Id.*

31. *Id.* at 1339.

32. *Dipoma v. McPhie,* 2001 UT 61, ¶ 18, 29 P.3d 1225 (emphasis added) (quoting *Limb v. Federat-*

ed Milk Producers Ass'n, 23 Utah 2d 222, 461 P.2d 290, 293 n. 2 (1969)).

33. *See, e.g., Pearson v. Pearson,* 2008 UT 24, ¶ 10 n. 8, 182 P.3d 353 (declining to apply the Utah Uniform Parentage Act to a child custody dispute because the parties did not argue or brief the issue under that law).

sens are incorrect in arguing that we have already decided the preemption issue. Having determined that we did not decide the issue in *Madsen I*, we now address the Madsens' contention that the Tenth Circuit decided the preemption issue in *Madsen II*.

### B. The Tenth Circuit Did Not Rule on the Merits of Federal Preemption In Madsen II

¶ 28 In *Madsen II*, the Tenth Circuit ruled on the Madsens' appeal from the federal district court, which had granted summary judgment in favor of Prudential on the basis of preemption:

> Under the federal preemption doctrine, Madsens have no claim against Prudential for interest on their escrow account. 12 C.F.R. § 545.6–11(c) clearly precludes the relief the Madsens are seeking.... More importantly, the regulation cited above does not appear to alter the federal law applicable to loans made before June 16, 1975, but instead appears to reaffirm the impact of 12 C.F.R. §§ 544.1 ("association is not required to distribute earnings on short-term savings accounts") and 541.5 (defining short-term savings account as including mortgage loan escrow accounts for taxes and insurance).[34]

The Madsens argued that the federal court lacked jurisdiction and appealed to the Tenth Circuit.[35] The issue on appeal was whether the federal court had federal question jurisdiction, specifically whether the suit arose under the Constitution or laws of the United States.[36] The Tenth Circuit held that federal jurisdiction existed only if the "federal right or immunity [is] an essential element of the plaintiff's cause of action, and that the federal controversy must be 'disclosed on the face of the complaint, unaided by the answer or by the petition for removal.' "[37] It went on to hold that "[b]ecause the Madsens have predicated their suit upon rights created under state law, the fact that federal regulations may create a defense to recovery on such a claim is immaterial to a finding of federal question jurisdiction."[38]

¶ 29 Although the Tenth Circuit explicitly ruled on jurisdictional grounds, the Madsens argue that the following language in the Tenth Circuit's opinion constitutes a decision on the merits of the preemption argument:

> Here, it is vigorously argued that application of state law would create a significant conflict because federal policy requires uniform nationwide standards for the handling of escrow accounts by federal savings and loan associations. This argument founders on the very language of the regulation cited to support it. Section 545.6–11(c) provides that a federal savings and loan association shall pay interest on escrow accounts if a state statute requires such payments to be made by state-chartered institutions, or if payments are required by contract. The regulation expressly anticipates that the obligation of a federal institution to pay interest on escrow accounts not only will vary from state to state, but from contract to contract.
>
> . . .
>
> Given the absence of a significant conflict between the federal policy expressed in section 545.6–11(c) and the use of state law, we hold that state law is applicable in determining whether Prudential *contracted to pay interest* on the Madsens' escrow account.[39]

¶ 30 This, the Madsens argue, is the Tenth Circuit's pronouncement that the federal regulation does not conflict with their claim for interest, and thus federal law does not preempt their state law claim.

¶ 31 The Madsens are incorrect. The discussion cited above is presented in response to Prudential's argument that the controversy required the court to apply federal common law in determining whether the parties had entered into a contract for the payment of interest. A controversy that requires the

---

34. 635 F.2d 797, 800 (10th Cir.1980).

35. *Id.*

36. *Id.*

37. *Id.* (quoting *Gully v. First Nat'l Bank*, 299 U.S. 109, 113, 57 S.Ct. 96, 81 L.Ed. 70 (1936)).

38. *Id.* at 801.

39. *Id.* at 802–03 (emphasis added).

application of federal common law necessarily arises under the laws of the United States. But federal courts only apply federal common law to cases in which there is "a significant conflict between some federal policy or interest and the use of state law."[40] The passage cited by the Madsens is the Tenth Circuit's acknowledgment that under the explicit terms of 21 C.F.R. § 545.6–11(c), lenders' interest obligations could be varied by contract between private parties. The question of whether such a private contract had been created is, as the Tenth Circuit concluded, governed by state law. Interest obligations that varied from state to state or from contract to contract would not disrupt a federal scheme requiring uniformity.

¶ 32 In this case, however, the Madsens have not claimed that a provision in the contract obligated Prudential to pay interest. Indeed, there is no such provision. Moreover, they concede that there is no applicable state statute. So while the federal regulation explicitly permits the interest obligation to vary by private contract or by state statute, in this case we have neither. And in the absence of a contract or statute, the regulation is clear that Prudential had no obligation to pay interest. The mere fact that the Tenth Circuit acknowledged that under the explicit terms of the regulation, the interest obligation may be established by private contract or statute in no way changes the fact that absent either, Prudential had no obligation to pay interest on the budget payment accounts.

¶ 33 Thus the Madsens are incorrect in arguing that this court or the Tenth Circuit has already decided the preemption issue, and it is appropriate that we resolve the issue in this appeal. For the reasons discussed in section II, we reverse the district court's ruling, hold that federal law preempts the Madsens' accounting claim, and remand with instructions to enter summary judgment in favor of WAMU. Because we decide that federal law preempts the Madsens' claim, it is unnecessary to reach the other issues in this appeal.

## CONCLUSION

¶ 34 We conclude that federal law preempts the Madsens' claim for profits earned on pledged funds in reserve accounts maintained by Prudential in connection with their real estate mortgage. Because federal law preempts the Madsens' cause of action, it is unnecessary to reach the other issues presented by the parties in this appeal. We reverse and remand with instructions to enter summary judgment in favor of WAMU.

¶ 35 Chief Justice DURHAM, Justice PARRISH, Judge GREENWOOD, and Judge WESTFALL concur in Associate Chief Justice DURRANT'S opinion.

¶ 36 Having disqualified himself, Justice WILKINS does not participate herein; District Court Judge G. MICHAEL WESTFALL sat.

¶ 37 Justice NEHRING does not participate herein; Court of Appeals Judge PAMELA T. GREENWOOD sat.

---

**40.** *Wallis v. Pan Am. Petroleum Corp.*, 384 U.S. 63, 68, 86 S.Ct. 1301, 16 L.Ed.2d 369 (1966).